STATE FARM FIRE AND CASUALTY COMPANY, Plaintiff-Appellant, v. BRIAN WATTERS, Defendant (L.S. *et al.*, Indiv. and as Parents and Next Friends of A.S. *et al.*, Minors, Defendants-Appellees).

Fifth District No. 5—93—0043

Opinion filed December 30, 1994.

Stephen W. Thomson and Charles C. Compton, both of Reed, Armstrong, Gorman, Coffey, Thomson, Gilbert & Mudge, P.C., of Edwardsville, for appellant.

Steven E. Katzman, of Katzman & Crego, of Belleville, for appellees.

JUSTICE LEWIS delivered the opinion of the court:

Plaintiff, State Farm Fire & Casualty Company (State Farm), filed a complaint for declaratory judgment in the circuit court of St.

Clair County, for a determination of whether there is coverage under a homeowner's policy issued by State Farm to Doris Watters (Doris), the mother of Brian Watters (Brian), for Brian's sexual misconduct against L.S.'s and R.S.'s three minor children. Both parents of the minor children and State Farm filed cross-motions for summary judgment, which the court denied. Following a hearing on the complaint for declaratory judgment, the court entered an order on December 22, 1992, holding that there was coverage under the homeowner's policy and that State Farm was to pay $100,000 pursuant to the settlement agreement in the underlying civil lawsuit which had prompted State Farm's filing of its complaint for declaratory judgment. State Farm appeals. We reverse for the reasons set forth below.

The facts pertinent to this appeal are as follows: In August 1988, and continuing for a period of time thereafter, Brian sexually molested the three minor children, who were eight, seven, and four years of age, respectively, at the time of the offenses. Brian also took nude and semi-nude photographs of himself and the children in sexually explicit positions. Brian was arrested for these offenses on October 1, 1988, when he came to pick up the developed photographs at a pharmacy. Brian was subsequently found guilty but mentally ill of aggravated criminal sexual assault. Brian's conviction was affirmed by this court on appeal. *People v. Watters* (1992), 231 Ill. App. 3d 370, 595 N.E.2d 1369.

On June 29, 1990, the parents, on behalf of the minor children and individually, filed a civil lawsuit against Brian and his mother, claiming that the children were injured physically and mentally by Brian's actions and that Doris was negligent in allowing the sexual molestations to occur in her home. In a subsequent amended complaint, the parents also sought damages for the negligent infliction of emotional distress upon the children, which resulted from Brian's sexual molestation.

Brian tendered his defense to State Farm for the civil lawsuit filed by the parents, which prompted State Farm to file its complaint for declaratory judgment. In its complaint, State Farm asked the court to find that it had no duty to defend or indemnify defendant under the homeowner's policy issued to Doris. State Farm claimed in its complaint that there was no coverage under the policy either because of the language of the policy itself or because of an exclusionary clause in the policy. State Farm claimed specifically that there was no coverage because (1) Brian's actions did not constitute an "occurrence" as that term is defined in the policy, *i.e.*, his intentional acts were not an "accident"; (2) Brian intended or

expected to cause the children's injuries, thereby falling under the exclusion clause of the policy; (3) the term "bodily injury" used in the policy does not encompass emotional harm; and (4) Brian's sexual misconduct was willful and malicious.

At the hearing on the complaint for declaratory judgment, State Farm presented the statements made to the police by Brian, Timothy, and Larry, Jr., and several evidence depositions. From these documents, it was revealed that Brian admitted to the police that he sexually molested and took pornographic photographs of the children, who were neighbors of Brian and his mother, for at least a month to a month and a half prior to October 1, 1988. At that time, Brian was 28 years of age, but he lived with his mother. Statements taken by the police from Timothy and Larry, Jr., corroborated Brian's sexual misconduct, indicating that Brian would give them sodas, apples, and other things when they participated in the sexual activities.

After Brian was arrested for the criminal charges filed against him, the Belleville police department called Steven Blair, an investigator for the Illinois Department of Children and Family Services, to investigate the allegations. Blair made arrangements for the children to be examined at Cardinal Glennon Hospital in St. Louis, Missouri. Tish LaRock Mullen, a registered pediatric nurse who worked in the sexual abuse management clinic at Cardinal Glennon Hospital, told Blair that the two boys disclosed to her that Brian had committed oral penetration and sodomy on them, and that they had witnessed Brian having intercourse with Amy. Blair also interviewed Dr. James Montelone, the physician at Cardinal Glennon who examined the children on October 5, 1988. Dr. Montelone told Blair that Larry and Timothy had "subtle findings" of anal penetration, but that Amy had "definite physical evidence of chronic sexual abuse."

Dr. Michael Armour, a clinical psychologist, testified in his evidence deposition that he had reviewed Brian's fitness to stand trial at the request of the State in the criminal prosecution. In conducting his evaluation of Brian, Dr. Armour reviewed other doctors' reports; Brian's school records; and the police reports done in the criminal case. Dr. Armour also interviewed Brian on May 7, 1990, for about two hours. In his interview with Brian, Brian talked about taking pictures of the children, of having sex with them, and of watching sexual videotapes with the children. Dr. Armour made a report to the court on May 30, 1990. Dr. Armour determined, as a result of his evaluation of Brian in 1990, that Brian's history and psychological testing established that Brian functions in the borderline to mild

mental retardation range of intelligence, and that Brian's full scale intelligence quotient (IQ) was 67. Dr. Armour determined that Brian was sane at the time he committed the sexual assaults on the children; that Brian appreciated the wrongfulness of his sexual misconduct; and that Brian was in touch with reality.

Dr. Armour further testified that, after reviewing Brian's case for the civil litigation, he was of the opinion that Brian intended to have sexual contact with the children, and the fact that Brian admitted that he had sexual contact with the children on more than one occasion indicated that Brian's actions were deliberate and possibly planned. Dr. Armour also stated that Brian concealed his activities with the children by doing them when his mother was not around. Brian told Dr. Armour that he would have stopped his sexual misconduct with the children if his mother were to come home, because he did not want to get into trouble. Brian also told Dr. Armour that he would have stopped his sexual activities with the children if a policeman would have come to the door of his home. That Brian took pornographic pictures of himself and the children indicated to Dr. Armour a "higher level of sophistication." Dr. Armour believed Brian's mental age to be that of a 16-year-old.

Dr. Armour admitted on cross-examination that he had testified at Brian's sentencing hearing for his criminal conviction that he did not believe prison was an appropriate sentence for Brian. He also admitted that Brian told him in his interview in May 1990 that he did not know it was wrong to engage in "that type of behavior" with the children. Dr. Armour further admitted that Brian did not want to hurt the children because Brian considered the children his friends.

Dr. Daniel Cuneo, a clinical psychologist, testified on behalf of the children that he had treated Brian in a sex offender treatment group for the last three years. He also had evaluated, at the request of the court, Brian's fitness to stand trial in the criminal case. Dr. Cuneo stated that Brian had been diagnosed as mildly mentally retarded from the time he was in kindergarten, that he had attended special education classes throughout his entire education, but that Brian had completed high school. Dr. Cuneo had an IQ test performed on Brian on July 31, 1989, which revealed that Brian had a full scale IQ of 67, the mild mental retardation range. In Dr. Cuneo's opinion, Brian functioned at a 10- to 11-year-old level.

Dr. Cuneo gave as his opinion that Brian was insane at the time he committed the sexual offenses on the children in 1988, *i.e.*, Brian could not *fully* appreciate the criminality of his conduct so as to conform to the requirements of the law. Dr. Cuneo believed Brian's

appreciation of right and wrong was from the level of a 10-year-old. In Dr. Cuneo's opinion, Brian did the acts because he had seen them in the movies, and if he saw other people doing these things, Brian concluded he could do them also. Dr. Cuneo did not think Brian's actions were well thought out or that Brian saw his actions as criminally wrong, since he took the photographs to a "fast-photo place" for development. Dr. Cuneo thought that Brian "just acted." Dr. Cuneo did not believe that Brian intended or expected to hurt anyone, especially not the children since they were his friends.

Brian and his mother also testified. Brian testified that he is presently 32 years old, and that he works at the Ben Franklin store with his mother. At work, he sweeps up and stocks shelves. Doris testified that Brian had lived with her all of his life, with the exception of about two years. Brian had to move back home after living out of the house because he was unable to manage his money. Doris stated that she did not witness any of the incidents between Brian and the children.

As a result of the evidence presented, the court entered a written order in which it determined that the homeowner's policy issued by State Farm to Doris provided coverage for Brian's actions, that State Farm was required to defend and to indemnify Brian in the civil lawsuit, and that State Farm must pay $100,000 to the children pursuant to a settlement agreement. State Farm appeals this order.

On appeal, State Farm raises two main issues: (1) that the court abused its discretion and erred in holding that there was liability coverage under the homeowner's policy issued by State Farm to Doris, and (2) that the court erred in finding that State Farm had a duty to defend and a duty to indemnify Brian in the civil lawsuit brought by the children. Under the first issue, State Farm raises four subissues: (1) that Brian's sexual assault on the children was not an accidental occurrence; (2) that child molestation is not a covered risk under a homeowner's insurance policy; (3) that insurance coverage for sexually molesting children is against public policy; and (4) that Brian's actions were intentional acts, and that the exclusionary clause precluded coverage.

Under Doris' homeowner's policy, an insured would have coverage for any "bodily injury" which was caused by an "occurrence." The term "occurrence" was defined in the policy as "an accident, including exposure to conditions." The policy did not define the term "accident." Thus, the policy involved herein is an "accidental occurrence" policy. The policy also contained an exclusionary clause which provided that coverage for bodily injury would be precluded where the bodily injury was "either expected or intended by an

insured." State Farm first argues on appeal that the homeowner's policy did not provide coverage, as Brian's sexual misconduct was not an accident, but that his acts were intentional.

In *Aetna Casualty & Surety Co. v. Freyer* (1980), 89 Ill. App. 3d 617, 411 N.E.2d 1157, the reviewing court discussed the term "occurrence," which was defined as an accident in the policy issued in that case. The *Freyer* court stated as follows:

> "This extension of coverage from 'accidents' to 'occurrences' has been considered to broaden coverage, and eliminates the need for an exact finding as to the cause of damages so long as they are neither expected nor intended from the standpoint of the insured. [Citation.] Nevertheless, the occurrence must still be accidental. An accident has been defined as an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned sudden or unexpected event of an inflictive or unfortunate character. The natural and ordinary consequences of an act do not constitute an accident. [Citation.] An injury caused by an assault and battery normally is not considered to be accidental [citation], even if the specific injury was not intended." (*Freyer*, 89 Ill. App. 3d at 619, 411 N.E.2d at 1159.)

From the foregoing, an occurrence which is defined as an accident involves the consideration of whether the injury was expected or intended from the standpoint of the insured. Such a consideration necessarily involves deciding whether Brian expected or intended the children's injuries in order to determine if the occurrences were an accident triggering policy coverage. However, this same consideration is applicable to the exclusion provision of the policy, *i.e.*, whether the injury suffered by the children was intended or expected by Brian. Much of the parties' briefs are devoted to this analysis, and it is upon our determination of this issue that our decision rests.

■ Whether the sexual molestation of minor children is covered under an exclusionary clause of a homeowner's policy, which precludes coverage if the insured expected or intended the injury, has been considered previously in this State. (*Scudder v. Hanover Insurance Co.* (1990), 201 Ill. App. 3d 921, 559 N.E.2d 559.) In *Scudder*, it was held that Scudder's sexual molestation of four minor boys was not covered under his homeowner's policy because of the exclusionary clause which precluded coverage if the insured's acts were intentional *and* the insured had the specific intent to injure the minors when he committed the sexual acts. (*Scudder*, 201 Ill. App. 3d 921, 559 N.E.2d 559.) The *Scudder* court held that, although the courts must look to the insured's specific intent to harm, this specific intent to harm would be inferred as a matter of law in sexual abuse cases, especially

when the victims are minors. (*Scudder*, 201 Ill. App. 3d 921, 559 N.E.2d 559.) By this holding, the *Scudder* court did not overrule the general rule that specific intent to harm must be found in order to apply an exclusion provision of an insurance policy, but the court instead created an exception to the general rule. (*Scudder*, 201 Ill. App. 3d 921, 559 N.E.2d 559.) The *Scudder* court also noted that its ruling was in agreement with the majority view held in many other States. *Scudder*, 201 Ill. App. 3d 921, 559 N.E.2d 559.

We find the reasoning of the *Scudder* court, and the holdings in numerous other cases which take the majority view of this issue, to be persuasive. (See *American Family Mutual Insurance Co. v. Purdy* (S.D. 1992), 483 N.W.2d 197; *Allstate Insurance Co. v. Mugavero* (1992), 79 N.Y.2d 153, 589 N.E.2d 365, 581 N.Y.S.2d 142; *Worcester Insurance Co. v. Fells Acres Day School, Inc.* (1990), 408 Mass. 393, 558 N.E.2d 958; *Mutual of Enumclaw v. Merrill* (1990), 102 Or. App. 408, 794 P.2d 818; *State Farm Fire & Casualty Co. v. Smith* (9th Cir. 1990), 907 F.2d 900; *State Farm Fire & Casualty Co. v. van Gorder* (1990), 235 Neb. 355, 455 N.W.2d 543; *Allstate Insurance Co. v. Troelstrup* (Colo. 1990), 789 P.2d 415; *Allstate Insurance Co. v. Jarvis* (1990), 195 Ga. App. 335, 393 S.E.2d 489; *N.N. v. Moraine Mutual Insurance Co.* (1990), 153 Wis. 2d 84, 450 N.W.2d 445; *Perreault v. Maine Bonding & Casualty Co.* (Me. 1990), 568 A.2d 1100; *Twin City Fire Insurance Co. v. Doe* (Ariz. Ct. App. 1989), 163 Ariz. 388, 788 P.2d 121; *Foremost Insurance Co. v. Weetman* (W.D. Pa. 1989), 726 F. Supp. 618, aff'd without op. (3d Cir. 1990), 904 F.2d 694, 696, 697; *Horace Mann Insurance Co. v. Leeber* (1988), 180 W. Va. 375, 376 S.E.2d 581; *Auto-Owners Insurance Co. v. Gardipey* (1988), 173 Mich. App. 711, 434 N.W.2d 220; *Allstate Insurance Co. v. Thomas* (W.D. Okla. 1988), 684 F. Supp. 1056; *Altena v. United Fire & Casualty Co.* (Iowa 1988), 422 N.W.2d 485; *Allstate Insurance Co. v. Roelfs* (D. Alaska 1987), 698 F. Supp. 815; *Rodriguez v. Williams* (1986), 107 Wash. 2d 381, 729 P.2d 627; *Illinois Farmers Insurance Co. v. Judith G.* (Minn. Ct. App. 1986), 379 N.W.2d 638; *Fireman's Fund Insurance Co. v. Hill* (1982), 314 N.W.2d 834.) As was stated in *Scudder* and many of the out-of-State cases, the injury in sexual abuse cases is inevitable and cannot be separated from the act itself. (*Scudder*, 201 Ill. App. 3d 921, 559 N.E.2d 559.) Therefore, we hold that Brian's specific intent to harm is inferred as a matter of law and coverage of his sexual misconduct is precluded under the homeowner's policy. This is so even though evidence was presented that Brian had a diminished capacity and could not form the intent to harm the children.

Specifically, an analogous case is *Auto-Owners Insurance Co. v. Gardipey* (1988), 173 Mich. App. 711, 434 N.W.2d 220, which is

persuasive to our reasoning. In *Gardipey*, an 18-year-old boy had sexual relations with a 10-year-old boy. Evidence was presented that, due to a disease, Gardipey was mentally slow, had spent his school years in special education programs, and was borderline mentally retarded. The court in *Gardipey* held that insurance coverage under Gardipey's parents' homeowner's policy was precluded under an exclusion clause which provided that bodily injury cannot be expected or intended from the standpoint of the insured in order to be covered under the policy. The basis of the court's decision was that Gardipey's intent to injure was established as a matter of law, and that evidence of Gardipey's subjective intent was irrelevant. The facts of the instant case are similar in that Brian was diagnosed as mildly mentally retarded and he attended special education classes at school. When the insured's specific intent to injure is inferred as a matter of law, evidence of the insured's diminished capacity is irrelevant.

It is also of note that Brian was found guilty but mentally ill in the related criminal case. (*Watters*, 231 Ill. App. 3d 370, 595 N.E.2d 1369.) Brian's conviction established that he had the capacity to form the intent to commit the acts, that he knew what he was doing, and that he could distinguish right from wrong. Criminal convictions can be used in civil cases as *prima facie* evidence that the accused either intended the victim's injuries or knowingly caused them. (*Bay State Insurance Co. v. Wilson* (1983), 96 Ill. 2d 487, 451 N.E.2d 880.) Thus, the children had the burden of showing that Brian did not have the capacity to form the intent or knowledge to cause the injury. We are expressly not ruling upon the issue of whether a homeowner's insurance company could be held liable under the policy provisions in the case at bar if the insured has been found to be insane in the underlying criminal case.

Dr. Cuneo's testimony that Brian was insane at the time of the offenses is not persuasive. He testified that Brian's understanding of right and wrong was from the level of a 10-year-old. Dr. Cuneo testified:

> "I'm not telling you that Brian didn't know that it might have been wrong, but the extent of wrongness. I'm saying he had extent of—you know, when my kids were three and four, if they did something wrong, they'd hide it. That doesn't mean they didn't know it was wrong. The extent is different. If I had a kid who was kicking soccer balls against an aluminum, you know, house, it would leave dents. He might know that he might—he shouldn't hit a soccer ball against the house, but he would never realize or think that, My God, this is going to leave dents. Now I got to replace all the siding. Look at all the bad things that has [*sic*] occurred. It's the same thing here."

This implies that Brian did have some understanding. Further, from statements made by Brian to Dr. Armour, it is clear that Brian understood that he had to hide his activities from his mother and the police, which implied that Brian understood that his actions were wrong.

Dr. Cuneo's reasoning that Brian did not fully understand the criminality of his acts because Brian took the pornographic photographs to a pharmacy for development is also not persuasive. In some cases pedophiles and pornographers do not comprehend that their conduct is wrong, and criminals with normal intelligence perform acts that are not explainable. For instance, in *People v. Hebel* (1988), 174 Ill. App. 3d 1, 527 N.E.2d 1367, the defendant, a dentist, who did not have any alleged diminished capacity, likewise was caught because he took his pornographic photographs to a fast-photo place for development. (See also *People v. Lerch* (1985), 134 Ill. App. 3d 643, 480 N.E.2d 1253.) Thus, given that Dr. Hebel and Lerch were caught in the same manner as Brian, the fact that Brian took his photographs to a pharmacy for development is not determinative of an inability to understand the wrongfulness of his acts; rather, it is more of a mistake in believing that a pharmacy would keep the transaction confidential.

The children, via Dr. Cuneo's testimony, wish to establish or impose a new burden upon the trier of fact, requiring a determination of the degree of which the wrongdoer understands that his acts might cause harm to the victim. Dr. Cuneo was successful in convincing the trial court that if Brian, because of his mental age, did not know right from wrong as well as a normally intelligent person, then Brian could not have intended to harm his victims. The difficulties presented in trying to make such a determination are illustrated by the differences of opinion between Dr. Cuneo and Dr. Armour as to Brian's capacity to understand right from wrong. Both psychologists admit that Brian knew right from wrong, but Dr. Cuneo felt that Brian did not understand the consequences of his acts as well as someone with a higher mental age.

A question immediately arises: what mental age must a wrongdoer attain to be held conscious of the consequences or incapable of understanding the consequences of one's acts? At what mental age are we prepared to say that a boy, who knows it is wrong to kick a ball against aluminum siding, does not "fully" appreciate the damage he is causing? Assuming that such a dividing line existed, how would that age be determined with any accuracy given the fact that, as shown in this case, psychologists often disagree as to the mental age of a person and what it means in relation to a person's ability to

understand right from wrong? Conclusions reached in interpreting I.Q. tests can be controversial. Suffice it to say, it would be a strange ruling to find Brian guilty of intentional crimes for which he could have been sent to the penitentiary and, yet, hold that Brian did not have the requisite intent for his acts under the civil law.

An appellate court should not create new requirements in the law that appear to be contrary to all precedent. We definitely should have some guidance from our legislature or our supreme court before this court ventures into the quagmire of trying to determine with any degree of certainty when would a person, who knew he was doing something wrong, intend or not intend the natural and probable consequences of his acts.

■ Next, we consider whether the fact that the children pleaded negligent infliction of emotional distress in their complaint brought their cause of action under the policy's coverage. We find that these allegations of negligent infliction of emotional distress are a transparent attempt to trigger insurance coverage. (See *Linebaugh v. Berdish* (1985), 144 Mich. App. 750, 376 N.W.2d 400.) The facts alleged as the basis of this tort are still Brian's intentional acts of molestation. He did not negligently inflict these acts on the children. For this tort to arise, there must be an allegation that the negligent infliction of emotional distress arose out of the negligent acts of a defendant, clearly not the case here. See *Corgan v. Muehling* (1991), 143 Ill. 2d 296, 574 N.E.2d 602; *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, 457 N.E.2d 1.

The children cite *Corgan* for the proposition that a person may be held liable for the negligent infliction of emotional distress upon another resulting from sexual misconduct. However, in *Corgan*, the liability was not based upon the act of sexual relations; rather, it was the breach of duty owed by a psychologist to his client that resulted in a finding of liability. If Muehling had not been a psychologist, he would not have been liable for any emotional distress that he might have caused Corgan by the illicit relationship. It does not take a great imagination to envision many examples of very intense emotional distress that may result to one partner from a sexual relationship, but the infliction of emotional distress, even if negligently caused, does not automatically result in a finding of liability. We would be more sympathetic to the children's argument if Brian had breached a duty established by law such as would have occurred if Brian had been entrusted with babysitting for the children.

The homeowner's insurance carrier should not be held liable simply because someone suffered unintended emotional distress from having sexual relations in the home. After all, parents may not

intend to harm their children by having incestuous relations, teenagers may explore sexuality unbeknownst to their parents, with harmful results, or a homeowner may cause unintended emotional distress to a boyfriend or girlfriend, if a pregnancy resulted from the relationship. (See *West American Insurance Co. v. Vago* (1990), 197 Ill. App. 3d 131, 553 N.E.2d 1181 (where the insured was held to have expected or intended harm to a waitress that he grabbed from behind and indulged in feigning a sexual act).) The emotional harm in these types of cases is a direct result of the intentional acts and not, as in *Corgan*, the result of a breach of trust created by the therapist-patient relationship. There are many unintended bad consequences caused by intentional acts, but the intent of the parties to the insurance contract was not to provide coverage in these types of cases.

Brian was not babysitting the children, and there was no evidence presented that the children were otherwise placed in his care. The only evidence presented of a relationship was that Brian considered the children his friends, and that they played together. This is hardly a basis for finding any duty arising from a special relationship and, therefore, a breach of a duty, resulting in the injuries to the children. Thus, the simple allegation of the tort of negligent infliction of emotional distress does not bring Brian's acts under the policy for coverage.

Lastly, we note that the children included in their pleadings a count against Brian's mother for having "negligently and carelessly allowed this sexual molestation and assault and battery to take place in her home, when she knew or in the excess [*sic*] of reasonable care should have known that this incident was taking place." This cause of action and potential coverage under the policy is not argued on appeal by either party. This is understandable, as there was no evidence presented before the trial court that Brian's mother had any knowledge of Brian's activities or what reasonable care she should have exercised. Plaintiff does not cite any authority that the parent of a developmentally disabled adult has a special duty to supervise and control the developmentally disabled adult. It would be discriminatory and grossly unfair to hold the parents of a developmentally disabled adult to a higher degree of responsibility for the conduct of their child than the degree of responsibility to which parents of a normal adult child are held. There was no evidence presented, and we refuse to presume, find, or take judicial notice, that developmentally disabled persons are some kind of menace to society. It would seem that the adult child with normal intelligence, who happens to have an addiction to alcohol or drugs or who is just plain mean, is more of a menace to society than the vast majority of

developmentally disabled persons, and we do not hold the parents of these so-called normal children to a duty to supervise their problem adult child.

Further, there was not any evidence that the children were entrusted to Doris Watters' care, thereby raising a duty to the children. The complaint only alleges, in effect, that homeowners have a duty to know what criminal acts other persons may be committing on their property. Since the parties did not argue or cite any authority for what may be a huge increase in the duties of homeowners, we decline to discuss and rule on the issue *sua sponte*.

Because we have determined that Brian's activities were not covered under his mother's homeowner's policy, it follows that State Farm had no duty to defend Brian or to indemnify his actions. Further, we need not consider the other arguments raised by State Farm, *i.e.*, that coverage for sexual abuse is against public policy and that neither party to the contract contemplated coverage for Brian's sexual misconduct when they entered into the contract. Suffice it to say that it is beyond the realm of the imagination that Brian's mother purchased her homeowner's insurance policy with Brian's sexual misconduct in mind. As it was stated in *Perreault v. Maine Bonding & Casualty Co.* (Me. 1990), 568 A.2d 1100:

> "Furthermore, homeowner's coverage for criminal sexual abuse of children is undoubtedly outside the contemplation of the parties to the insurance contract; indeed, '[t]he average person purchasing homeowner's insurance would cringe at the very suggestion that [the person] was paying for such coverage. And certainly [the person] would not want to share that type of risk with other homeowner's policyholders.'" *Perreault*, 568 A.2d at 1102, quoting *Altena v. United Fire & Casualty Co.* (Iowa 1988), 422 N.W.2d 485, 490.

After this opinion was prepared and being circulated among the panel, the opinion in *Western States Insurance Co. v. Bobo* (1994), 268 Ill. App. 3d 513, was filed. Some issues are similar, and both panels of justices appear to agree as to the law.

■ For the foregoing reasons, the judgment of the trial court of St. Clair County is reversed. State Farm has no duty to defend or indemnify Brian Watters or Doris Watters in the underlying civil lawsuit.

Reversed.

WELCH and CHAPMAN, JJ., concur.