In re Jerri S. RUSSELL, Debtor.

Jerri S. Russell (formerly Jerri Russell Brame), t/a T & J Ventures and Darrell Wilson, Plaintiffs,

v.

Cincinnati Insurance Company, an Ohio Company, Defendant.

Bankruptcy No. 97–52161C–7W.

Adversary No. 97–6061.

United States Bankruptcy Court, M.D. North Carolina, Winston–Salem Division.

Jan. 4, 2001.

John A. Northen, Chapel Hill, NC, Jeffrey S. Lisson, Winston–Salem, NC, for plaintiffs.

James H. Kelly, Jr., Winston–Salem, NC, for defendant.

## MEMORANDUM OPINION

WILLIAM L. STOCKS, Bankruptcy Judge.

This adversary proceeding came before the court on September 28, 2000. Jeffrey S. Lisson appeared on behalf of plaintiff Darrell Wilson and plaintiff Jerri S. Russell appeared *pro se*. James H. Kelly, Jr. and Susan H. Boyles appeared on behalf of the defendant. The defendant's motion for summary judgment and the trial of this adversary proceeding both were calendared for hearing. The court took the motion for summary judgment under advisement and proceeded with the trial of this adversary proceeding. The parties relied upon the same evidence as their trial evidence as had been offered in support of and in opposition to the motion for summary judgment. Rather than resolve this adversary proceeding by summary judgment, the court will resolve this proceeding as a trial and make findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. Accordingly, having considered the evidence offered by the parties, the court makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## NATURE OF PROCEEDING

This is a declaratory judgment action seeking an interpretation of commercial insurance policies issued by the defendant to Jerri S. Russell (formerly Jerri R. Brame), t/a T & J Ventures. Plaintiff Jerri S. Russell ("the Debtor") is a Chapter 7 debtor in the underlying bankruptcy case and is the named insured in the policies which were issued by the defendant.

Plaintiff Darrell Wilson is alleged to be an insured under the policies based upon his being an employee of the Debtor during a portion of the period covered by the insurance policies. In the complaint, the plaintiffs seek a declaration that the plaintiffs are entitled to defense and indemnity from the defendant with respect to some or all of the claims which have been asserted against the plaintiffs in two civil actions filed in the Superior Court of Forsyth County ("the State Court litigation") by Philip Staton, Ingeborg Staton and Mercedes Staton ("the Statons"). The defendant denies that any coverage is provided under the policies and seeks a declaration that the defendant does not have a duty to defend or indemnify either of the plaintiffs in the State Court litigation.

## FACTUAL BACKGROUND

The Statons inherited a significant block of stock in a holding company that had exclusive rights to bottle and distribute Coca–Cola products in Mexico, Colombia and Brazil. The stock was held in a trust until approximately 1987. In 1987, the Statons acquired full ownership and control of the stock. The Statons spent significant periods of time in Colombia, but also had personal holdings in the United States. Because the Statons were in Colombia much of the time, they needed someone in the United States to assist with the management of their assets located in the United States. Also, because of the political and cultural climate of Colombia, the Statons also required security services while living in Columbia, as well as while traveling abroad.

Beginning in approximately 1988, the Debtor entered into various agreements with the Statons to provide personal and security services to them. On or about January 4, 1988, Philip Staton entered into an Agreement for Business Services with the Debtor, trading as T & J Ventures. Under this Agreement, the Debtor was to provide to the Statons services related to the production and protection of income, including security services, legal services, accounting services, investigative services and other consultative and/or management services. Thereafter, on or about November 1, 1991, Philip Staton executed a power of attorney under which the Debtor and her husband at the time, Tom Brame, were appointed agents of Mr. Staton "with the power to act in my name, place and stead in any way which I myself could do if I were personally present with respect to all financial matters and endorsements." Thereafter, Ingeborg Staton also executed a power of attorney in favor of the Debtor giving the Debtor broad powers with respect to property, banking and other business transactions, as well as personal relationships and affairs.

In 1993, the Statons sold their stock in the South American holding company and received more than $119,500,000.00. These funds were deposited into an account at Centura Bank in Winston–Salem known as the PIM Group Clearing Account. Shortly after the funds were deposited in Centura Bank, the Debtor and her former husband assumed control of the funds. The Debtor's husband thereafter became ill, at which time the Debtor assumed sole responsibility for providing services to the Statons and became the primary contact with the Statons and the professional advisors who assisted the Statons in managing their assets. In February of 1994, the Debtor entered into a contract with Darrell Wilson under which Mr. Wilson was employed by the Debtor to provide security services. A similar agreement was entered into in February of 1996. Mr. Wilson was employed by the Debtor from February of 1994 until approximately May of 1996.

## THE STATE COURT LITIGATION

On March 11, 1996, Philip Staton filed suit in the Superior Court of Forsyth County against the Debtor, Mr. Wilson and several other defendants. The complaint in the Forsyth County action asserts claims for breach of fiduciary duty, conversion, constructive fraud, fraud, unfair and deceptive trade practices, purported gross negligence and grossly negligent misrepresentation. The suit seeks compensatory and punitive damages, as well as an accounting and a constructive trust on assets allegedly purchased with Staton funds.

In June of 1996, Ingeborg and Mercedes Staton intervened in the Forsyth County action and filed a complaint against the Debtor and certain other defendants. The complaint filed on behalf of Ingeborg and Mercedes Staton alleges that the Debtor did not have authority to act on their behalf in many of the financial transactions involving their funds and that the Debtor concealed various transfers of funds from them. Ingeborg and Mercedes Staton assert claims for conversion, breach of fiduciary duty, misappropriation, conspiracy to misappropriate, constructive fraud, fraud, violations of the state RICO statute, unfair and deceptive trade practices, purported negligence and negligent and/or intentional misrepresentation. Mercedes and Ingeborg Staton also seek compensatory and punitive damages from the Debtor as well as a constructive trust on property allegedly purchased with their assets.

In the complaints filed in State Court the Statons allege that the Debtor was instructed to place the Staton funds in conservative investments such as treasury bills. The Statons allege that contrary to these instructions, funds were withdrawn from the PIM account and "invested" in new businesses that the Debtor and her husband had formed, including Global Sport Management Co., Global Land Management, Inc., S & B Investments, and J.R.B. Investments, Inc. According to the allegations of the Statons, during the two years following the deposit of their funds at Centura, the Debtor and her husband transferred between $30 million and $40 million of the Statons' assets to entities owned or controlled by the Debtor and her husband. The Statons assert that these unauthorized transfers took the form of direct cash transfers, the purchase of real and personal property such as expensive cars, airplanes and a lavish condominium at Myrtle Beach, and use of the funds for personal expenses and accommodations.

The Statons allege that in September of 1995, the Debtor informed Philip Staton that she had discovered "irregularities" in the way her husband had been dealing with the Statons' assets and that she was planning to divorce him. Although the Debtor allegedly assured the Statons that she would trace and recover their assets, the Statons allege that the Debtor and Mr. Wilson also were involved in unauthorized transfers from the Statons' accounts and that the Debtor and Mr. Wilson were concealing the whereabouts of assets from the Statons. As a result, in February of 1996, Mr. Staton revoked the power of attorney that he had granted to the Debtor.

In their claims against Mr. Wilson, the Statons allege that Mr. Wilson used his position with the Debtor to transmit false and misleading information concerning the dissipation of the Staton's assets. The Statons also allege that Mr. Wilson transferred certain security vehicles in Columbia into his own name and that he improperly transferred weapons and ammunition belonging to Mr. Staton to a Columbian corporation.

## DISCUSSION

A. Rules of Construction and Interpretation.

■ An insurer's duty to defend ordinarily is measured by the facts as alleged

in the pleadings, while its duty to pay is measured by the facts ultimately determined at trial. *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 340 S.E.2d 374, *reh'g denied*, 316 N.C. 386, 346 S.E.2d 134 (1986). When the complaint alleges facts under which the injury is covered by the policy, then the insurer has a duty to defend, whether or not the insured ultimately is held liable. *Id.* Conversely, when the complaint alleges facts which reflect that the event in question is not covered, and the insurer has no knowledge that the facts are otherwise, then it is not bound to defend. *Id.* In determining whether Cincinnati has a duty to defend in this case, the court must "constru[e] the language of the coverage, its exclusions and exceptions, and determin[e] whether events as alleged in the pleadings and papers before the court are covered by the policy." *Id.* at 691, 340 S.E.2d at 377. If none of the alleged acts are covered, there is no duty to defend; however, if the alleged acts include those both covered and excluded from coverage under the policy, the insurer must defend. *Id.* at 691, n. 2, 340 S.E.2d at 377, n. 2; *Wilkins v. American Motorists Ins. Co.*, 97 N.C.App. 266, 269, 388 S.E.2d 191, 193, *review denied*, 327 N.C. 145, 394 S.E.2d 189 (1990).

■ The meaning of the insurance contract is arrived at by giving non-technical words their ordinary meaning unless the context clearly indicates otherwise. *Woods v. Nationwide Mutual Ins. Co.*, 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978). If the policy contains definitions, however, those will control the interpretation of the terms defined. *Id.* at 505–06, 246 S.E.2d at 777. If the policy language is clear and unambiguous, the court must enforce the contract as written, and it cannot construe the policy to create coverage beyond that which the parties contracted. *Grant v. Emmco Ins. Co.*, 295 N.C. 39, 43, 243

S.E.2d 894, 897 (1978). If the policy language is ambiguous or reasonably is susceptible to different interpretations, the court must adopt the construction most favorable to the insured. *Id.* North Carolina courts construe coverage provisions broadly. *E.g., State Capital Ins. Co. v. Nationwide Mut. Ins. Co.*, 318 N.C. 534, 350 S.E.2d 66 (1986). Exclusions, on the other hand, are construed narrowly. *E.g., Holcomb v. United States Fire Ins. Co.*, 52 N.C.App. 474, 279 S.E.2d 50 (1981).

B. Burden of Proof.

■ The insured has the burden of bringing himself within the insuring language of the policy. *Nationwide Mut. Fire Ins. Co. v. Allen*, 68 N.C.App. 184, 188, 314 S.E.2d 552, 554, *review denied*, 311 N.C. 761, 321 S.E.2d 142 (1984). Once it has been determined that the insuring language embraces a particular claim, the burden then shifts to the insurance company to prove that a policy exclusion excepts the claim from coverage. *Id.*

In the present case, in order to bring themselves within the coverage of the Cincinnati policies, the plaintiffs first must show that the claims alleged in the State Court litigation arise out of an "occurrence" as defined in the policy and resulted in either "bodily injury" or "property damage" as those terms are defined in the policy. If plaintiffs do so, then the burden shifts to Cincinnati to show that any covered claims fall within the one or more of the exclusions relied upon by Cincinnati.

C. Discussion of Pertinent Policy Provisions.

1. The Claims Asserted Against the Plaintiffs Do Not Involve "Bodily Injury."

■ The insuring provision of Cincinnati's Commercial General Liability Coverage Form reads:

1.  Insuring Agreement

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

The policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." To bring a claim within this coverage provision, it must appear that the Statons allege in the State Court litigation that they suffered some mental or physical injury or ailment as a result of the plaintiffs' actions.

In the present case, it is clear from the complaints filed by the Statons that all of the claims alleged against the plaintiffs involve purely economic losses. Rather than relying upon any bodily injury or ailment, the Statons' complaints ask for compensatory and punitive damages based on the dissipation of their assets. None of the pleadings contain any allegation of any sort of "bodily injury" within the meaning of the Cincinnati policy provisions.

2.  The Claims Asserted Against the Plaintiffs Do Not Involve "Property Damage."

■■■ The Cincinnati policies define "property damage" as:

a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

With the exception of certain vehicles and armaments which will be discussed *infra*, the Statons seek damages for purely economic losses based on the conversion and dissipation of funds, *e.g.*, bank accounts and other forms of investment. Contrary to the arguments of the plaintiffs, such losses do not result from physical injury to or loss of use of "tangible property" as required by the policy.

Plaintiffs' contention that economic losses should be considered "tangible property" for purposes of insurance coverage involves a matter which apparently has not been addressed by the North Carolina courts. However, cases from other jurisdictions consistently have concluded that economic loss claims such as lost profits, loss of an investment or loss of the anticipated benefit of a bargain, do not involve "the loss of use of tangible property" and therefore do not constitute property damage for purposes of insurance coverage. *E.g., Coulter v. CIGNA Prop. & Cas. Co.*, 934 F.Supp. 1101 (N.D.Iowa 1996)(holding that alleged misuse of inheritance check, money, and real estate did not involve "loss of use of tangible property" and therefore did not constitute "property damage" under insurance policy); *Potomac Ins. Co. of Illinois v. Peppers*, 890 F.Supp. 634 (S.D.Tex.1995)(holding that economic loss was not property damage covered by policy.); *Security State Bank of Kansas City v. Aetna Cas. & Sur. Co.*, 825 F.Supp. 944, 948 (D.Kan.1993) (holding that policy did not cover claim arising from loss of escrow payments because they were not tangible property); *American States Ins. Co. v. Martin*, 662 So.2d 245 (Ala.1995)(holding that economic losses arising from bad or improper investments are not considered "tangible property"); *Johnson v. Amica Mut. Ins. Co.*, 733 A.2d 977 (Me.1999)(holding allegedly converted bank account funds and the right to payment are not covered by homeowners policy because they are not tangible property).

In the present case, the Statons allege that they entrusted their money to the Debtor, and contrary to their instructions,

the Debtor put the money into risky business ventures owned by the Debtor and her husband and purchased homes, cars and other assets for the use of herself and her husband, and then concealed her misconduct from the Statons. The Statons further allege that Mr. Wilson was aware of what the Debtor was doing and assisted her in her misappropriation and deception. Like the situation in *Martin* and *Security State Bank,* these allegations center on loss of money contained in accounts that the Debtor was managing and loss of expected profits associated with investments that the Debtor was supposed to make. There are no allegations of any injury to tangible property and hence no coverage for the losses alleged by the Statons.

The only allegations that potentially relate to "tangible property" are those alleging that Mr. Wilson converted armored cars, weapons and accessories. Even if these allegations could be regarded as involving injury to or loss of use of tangible property, plaintiffs still must show that such injury or loss was caused by an "occurrence", which they failed to do. Additionally, other provisions in the policies exclude the claim involving the vehicle and armaments from coverage.

### 3. The Damages Sought from the Plaintiffs Were Not Caused by an "Occurrence."

The Cincinnati policies require as a condition of coverage that the bodily injury or property damage sought by a claimant be caused by an "occurrence." An "occurrence" is defined in the policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The North Carolina courts have defined an "accident" as "an unforeseen event, occurring without the will or design of the person whose mere act causes it; an unexpected, unusual or undesigned occurrence; the ef-

fect of an unknown cause, or, the cause being known, an unprecedented consequence of it; a casualty." *Waste Management,* 315 N.C. at 694, 340 S.E.2d at 379.

In the present case, the complaints include claims for fraud, conversion and unfair and deceptive trade practices. These claims obviously would not be covered as an "occurrence" because they involve allegations that the plaintiffs intentionally acted wrongfully. The plaintiffs argue that coverage nonetheless exists, however, because there are other claims in the complaints in which their conduct is characterized as negligence or a breach of fiduciary duty, which plaintiffs assert do constitute "occurrences" within the meaning of the Cincinnati policies. The problem with this argument is that the North Carolina courts have refused to allow a party's characterization of conduct as "negligence" to trigger insurance coverage when, in reality, the thrust of the allegations is intentional conduct.

In *Eubanks v. State Farm Fire & Cas. Co.,* 126 N.C.App. 483, 485 S.E.2d 870, *disc. review denied,* 347 N.C. 265, 493 S.E.2d 452 (1997), the plaintiffs filed a tort action against State Farm's insured for intentional infliction of emotional distress based on allegations that the insured had hired a "hit man" to kill them. The plaintiffs later amended their complaints to add a claim for negligent infliction of emotional distress and obtained a judgment. The plaintiffs then sued State Farm to collect the judgment under the homeowners policy issued by State Farm. The North Carolina Court of Appeals held that the policy did not provide coverage because intent to inflict injury could be inferred from the acts of the insured giving rise to the judgment. *Id.* at 487, 485 S.E.2d at 872. The Court rejected the argument that the negligent infliction of emotional distress claim triggered coverage, stating:

In their amended complaint, plaintiffs reiterated the characterization of Howell's conduct...and asserted that "it was reasonably foreseeable that such extreme and outrageous conduct would cause and did cause severe and/or serious emotional distress" to plaintiffs.

Taking the facts as alleged in plaintiffs' amended complaints [citation omitted], we agree with the defendant that the attempted amendments are "but a different characterization of the same wilful act.... [They] allege no new facts...nor...refute the original allegations."

*Id.* at 489, 485 S.E.2d at 873; *see also State Auto Ins. Cos. v. McClamroch,* 129 N.C.App. 214, 497 S.E.2d 439 (1998)(holding that, despite allegations of negligence, policy's intentional acts exclusion barred coverage for tort claims asserted by physician based upon the picketing of his residence by the insureds); *State Farm Fire & Cas. Co. v. Watters,* 268 Ill.App.3d 501, 510, 205 Ill.Dec. 936, 644 N.E.2d 492 (1994)(adding claim for negligent infliction of emotional distress to a lawsuit alleging sexual molestation of children was "a transparent attempt to trigger insurance coverage."), *appeal denied,* 208 Ill.Dec. 369, 649 N.E.2d 425 (Ill.1995).

In this case, the complaints make clear that all of the claims are based upon intentionally wrongful conduct involving the knowing misappropriation of assets and the concealing of such misconduct under circumstances in which it was clear that the Statons would be deprived of their money and sustain loss. The alleged misconduct of the plaintiffs is set forth in some detail in the Amended and Restated Complaint which was filed on behalf of Philip Staton. According to the complaint, the Statons "accepted offers of assistance with asset administration and security management from Jerri Brame" [the

Debtor] in 1988. Paragraph 19. Thereafter, in the 1990's the Brames "began a pattern of misusing and concealing misuse of Staton funds." Paragraph 27. The "misuse" and "misappropriation" became large scale after the Statons deposited some $119,500,000.00 into the PIM account at Centura Bank in Winston–Salem. After these funds were deposited, "the Brames embarked upon a course of using the funds for their own personal purposes [and] concealed and [were] able to conceal the fact that they had done so." Paragraph 38. The actions of the Brames are described as "defalcations" which were "actively concealed by the Brames" in paragraph 39. According to paragraph 40, the Brames misused the power of attorney and authorizations obtained from the Statons "to misappropriate, dissipate or otherwise place outside the reach of the Statons scores of millions of dollars in Staton assets." According to paragraphs 47 and 48, when the Brames set up the account at Centura, instead of setting it up as an account for the Statons, they established the account as an account for a partnership in which the Brames were the partners and thereafter treated the Staton funds as if they were funds of the Brames. Additionally, the Brames "set up multiple additional accounts which were used to receive, conceal from [the Statons] and further the dissipation of millions of dollars [from the Statons]." Paragraph 57. According to paragraph 106, the misappropriation included "siphoning misappropriated Staton funds into Brame enterprises such as GSM, labeling them as 'loans' from the Statons and when the enterprises failed converting the loans into worthless unissued stock carried on the books and records of such enterprises in the names of the Statons, without knowledge by the Statons that loans had been made or stock created in their names." By the fall of 1995, the losses attributable to Brame en-

terprises financed with misappropriated Staton money had become so large that the losses no longer could be concealed. Paragraph 107. At that point, according to the complaint, Jerri Brame, Mr. Wilson and Mr. Hirsh entered into a conspiracy to mislead the Statons by blaming such losses on Tom Brame, the estranged husband of Jerri Brame, and falsely representing to the Statons that a full investigation was underway. According to the complaint, in September of 1995, "Jerri Brame claimed that she had been working for approximately a year with Hirsh and Darrell Wilson to unearth the nature and extent of Tom Brame's activities. In fact, they had been working far longer and their purpose was to conceal misappropriations, not reveal them." Paragraph 110. The complaint details the Debtor's unauthorized expenditures—$9 million to fund a business established by the Debtor and her husband; $10 million to fund another business organized and owned by the Debtor and her husband; $9.5 million to fund loans or "investments" for the Debtor and family members, including the purchase of cars, homes and a corporate jet for the Debtor's use; and $1 million paid directly to the Debtor and her ex-husband. Paragraph 32 of First Amended Complaint.

As to Mr. Wilson, the complaint alleges that Wilson "advised and conspired with Jerri Brame and Charles Hirsh to conceal and further the misappropriation of Staton Funds utilizing as an element in such concealment and misappropriation the coercive effect of security services he purported to provide for Philip, Ingeborg and Mercedes Staton." The coercive element alleged is that Mr. Wilson threatened to remove security coverage for the Statons in order to assist the Debtor with her efforts to conceal the misappropriations and losses. Paragraph 10. The complaint alleges in paragraph 101 that Mr. Wilson and Jerri Brame "acted together and indi-

vidually to conceal and misappropriate Staton assets" and that Wilson "knew of the Brame misappropriations" and "consulted extensively ... regarding how to conceal and further these misappropriations." Paragraphs 101–102. The complaint further alleges that Mr. Wilson caused certain armored vehicles owned by the Statons to be titled in his name and that Mr. Wilson thereafter refused to return the vehicles unless he received a $10,000.00 payment from the Statons. Paragraphs 146–147. Mr. Wilson also allegedly "caused certain of the Armaments (the 'Converted Armaments') to be removed from the common ownership and possession of Philip, Ingeborg and Mercedes Staton by ordering the Security Employee under Darrell Wilson's supervision ... to deliver the Converted Armaments to a third party ... who was acting in concert with Wilson and Brame." Paragraph 150. The complaint alleges that these actions on the part of Mr. Wilson constituted conversion of the vehicles and armaments. Paragraph 152.

Similar allegations against the plaintiffs are made by Ingeborg and Mercedes Staton, who also assert claims for conversion, misappropriation, breach of fiduciary duty, fraud, and "a pattern of racketeering activity" in violation of Chapter 75 of the General Statutes. Second Am. Intervenors' Complaint at ¶¶ 345–472.

Even though the Statons characterize some of the claims which follow the above allegations under a "negligence" heading, it is clear that such claims are not truly based on unintentional, negligent conduct. The "negligence" claims in the Intervenors' complaint do not appear until the Twenty-fifth Claim for Relief and specifically incorporate by reference all of the prior allegations concerning intentional acts. Second Am. Intervenors' Complaint at ¶¶ 436–440. Likewise, in Philip Staton's complaint, the allegations of negligence

against Wilson do not appear until the Sixth Claim for Relief and incorporate by reference the prior allegations of intentional conduct. Am. and Restated Complaint at ¶¶ 269–272.

Like the plaintiffs in *Eubanks,* the Statons have attempted to recast their allegations of intentional conduct under a heading of "negligence." They have not offered any new facts or refuted the original allegations involving only intentional harm. It follows that the complaints do not allege an "occurrence" within the meaning of the policies issued by Cincinnati.

4. Any Possible Coverage for Property Damage Caused By An Occurrence Involves Property In the Care, Custody or Control of the Plaintiffs and Is Excluded.

Even if any of the damages sought by the Statons for conversion of the armored vehicles and armaments could be regarded as "property damage" caused by an "occurrence", the policies issued by Cincinnati contain exclusions which operate to exclude any such "property damage" from coverage under the policies. One such exclusion provides that the insurance under the policy does not apply to "property damage" to personal property in an insured's "care, custody or control". Similar policy language was interpreted in *South Carolina Ins. Co. v. Southeastern Painting Co., Inc.,* 77 N.C.App. 391, 335 S.E.2d 66 (1985), *cert. denied,* 315 N.C. 591, 341 S.E.2d 30 (1986). There, the defendant had been hired to conduct sandblasting operations on a military base. During the course of the job, some of the windows in the barracks were damaged. The general contractor was required to pay for replacing the windows and then sued the insurer in an attempt to get reimbursement for these costs. The complaint alleged that the defendant negligently damaged the windows during its sandblasting operations by failing to protect the windows in breach of its subcontract. The insurer refused to pay based on the "care, custody or control" exclusion in its policy. In affirming a summary judgment in favor of the insurer, the court stated:

> It is clear from the language of the primary contract and subcontract that Southeastern as subcontractor had a contractual duty to protect the windows during sandblasting. The contracts' provisions demonstrate that the barracks windows were left in Southeastern's care or custody in the performance of the subcontract. Under the provision of South Carolina's exclusions either care custody or control, or the exercise of physical control exclude coverage under the policy.

*Id.* at 394, 335 S.E.2d at 68.

Courts in other states similarly have held that the "care, custody or control" exclusion is clear and unambiguous and consistently have applied it to situations in which the insured was exercising control over the claimant's property. *E.g., International Derrick & Equip. Co. v. Buxbaum,* 240 F.2d 536 (3d Cir.1957)("[W]here the property damaged is under the supervision of the insured and is a necessary element of the work involved, the property is in the 'care, custody or control' of the insured."); *Caisson Corp. v. Home Indem. Corp.,* 151 Ill.App.3d 130, 104 Ill.Dec. 508, 502 N.E.2d 1168 (1986)(holding that insurance policy excluded coverage for concrete pumping truck damaged on job site because insured had control of the truck at the time of the accident); *Keller v. Case,* 757 So.2d 920 (La.Ct.App.2000)(holding that boarding stable's insurance policy did not provide coverage for damages arising out of the death of plaintiff's horse because horse was in the "care, custody or control

of an insured"); *Valentine–Radford, Inc. v. American Motorists Ins. Co.*, 990 S.W.2d 47 (Mo.Ct.App.1999)(holding that insurance policy did not provide coverage for lawsuit alleging negligence and conversion of personal files on computer because computer was in the care, custody, or control of insured when damage occurred); *Hertz Corp. v. Smith*, 441 Pa.Super. 575, 657 A.2d 1316 (1995)(holding that personal automobile insurer did not provide coverage for damage to car rented by insured because of care, custody and control exclusion).

The guns, ammunition, cars and related property were, according to the complaints, in the control of Mr. Wilson and the Debtor as the employer of Mr. Wilson. According to the complaints the armored vehicles and the guns and related property were used by security employees under the supervision of Mr. Wilson in the course of providing security for the Statons in South America. The Statons allege that Mr. Wilson used his control over the guns and ammunition in order to have such property delivered to a Colombian agent for his own benefit. Am. and Restated Complaint at ¶¶ 150–151. Without the knowledge or consent of the Statons, Mr. Wilson allegedly transferred title to the armored cars to himself and thereafter would not allow the vehicles to be used by the Statons. When the Statons requested that the vehicles be returned to them, Mr. Wilson allegedly refused to do so unless the Statons paid him $10,000.00 and refused to allow the Statons to gain possession of the cars. *Id.* at ¶¶ 146–152. These allegations reflect unequivocally that the cars and armaments were in the custody or control of Mr. Wilson. In fact, Mr. Wilson could commit the acts alleged against him only if the property was within his control. This brings the conversion claim squarely within the "care, custody or control" exclusion, with the result that the claims involving conversion of the vehicles and armaments are not covered under the policies. Moreover, if the economic losses allegedly sustained as a result of the Debtor's conversion or misappropriation of the Staton funds could be regarded as "property damage", it is clear that the funds and other intangible assets involved in these claims also were in the "care, custody or control" of the Debtor and likewise excluded from coverage.

5. The Policies Exclude Coverage for the Plaintiffs' "Intentional Acts."

The Cincinnati policies specifically exclude coverage for damage that results from intentional acts. The pertinent policy language provides:

This insurance does not apply to:

a. Expected or intended injuries

"Bodily injury" or "property damage" which may reasonably be expected to result from the intentional or criminal acts of an Insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than actually expected or intended.[1]

■ The North Carolina courts have held that an intentional act is excluded under a liability policy if the act is (1) intended to cause injury or damage or (2)

1. This is the language contained in the third policy issued by Cincinnati which was in effect from February 28, 1996, until it was cancelled on February 12, 1997. The language in the earlier two policies, extending from February 28, 1990, until February 28, 1996, provided:

This insurance does not apply to:
a. "Bodily injury" or "property damage" expected or intended from the standpoint of the insured.
The exclusion in the earlier policies is applicable for the same reasons that the later exclusion is applicable.

substantially certain to cause injury or damage. *See Henderson v. U.S. Fidelity & Guar. Co.,* 124 N.C.App. 103, 110, 476 S.E.2d 459, 464 (1996), *aff'd,* 346 N.C. 741, 488 S.E.2d 234 (1997)(holding that insurance policy did not provide coverage because insured-builders misrepresentations to home buyers concerning flooding on lots were substantially certain to cause injury); *Russ v. Great Am. Ins. Cos.,* 121 N.C.App. 185, 464 S.E.2d 723 (1995), *disc. review denied,* 342 N.C. 896, 467 S.E.2d 905 (1996)(holding that intent to injure may be inferred as a matter of law in sexual harassment case); *Commercial Union Ins. Co. v. Mauldin,* 62 N.C.App. 461, 303 S.E.2d 214 (1983)(holding that insured's firing gun with intent to shoot his wife but mistakenly shooting her friend was not covered under the policy because insured should have anticipated that a bullet might hit the friend); *see also Patti v. Continental Cas. Co.,* 126 N.C.App. 643, 486 S.E.2d 233 ("[I]t 'may be inferred as a matter of law' that [employer] knew it was probable that [employee] would suffer injuries" where employer intended to terminate employee and employee alleged that termination was wrongful), *disc. review denied,* 347 N.C. 401, 494 S.E.2d 417 (1997); *Erie Ins. Group v. Buckner,* 127 N.C.App. 405, 489 S.E.2d 901 (1997)(holding that intentional acts exclusion of homeowners policy, under Virginia law, precluded coverage for insured who acted in self-defense).

█ The insured's subjective intent is not determinative. Courts view the evidence in an objective light to determine whether the insureds should have anticipated their actions likely would cause injury. *Henderson,* 124 N.C.App. at 110, 476 S.E.2d at 464 ("[I]ntent to injure may be inferred as a matter of law from the intent to act ... notwithstanding [the insured's] assertions that he did not intend or anticipate his misrepresentations to injure or

damage plaintiffs"); *see also Nationwide Ins. Co. v. Bd. of Trustees of the Univ. of Illinois,* 116 F.3d 1154 (7th Cir.1997)(holding that insured expects or intends an injury when he acts with an intent or conscious disregard that damage will result).

█ The evidence in this case establishes that the claims alleged against the plaintiffs are based upon intentional conduct on the part of the plaintiffs which plaintiffs knew was contrary to the rights of the Statons and substantially certain to result in loss and damage to the Statons. The essence of the claims alleged in the complaints is that the Debtor misappropriated money of the Statons and used the misappropriated money to fund businesses owned by the Debtor and to purchase homes, cars, an airplane and other extravagant assets for the Debtor and her husband. According to the Statons, the Debtor concealed these misappropriations for as long as possible and then concealed and misrepresented her involvement in the misappropriations through untrue and false representations to the Statons. The basis for the claim against Mr. Wilson is that he was fully aware of the misappropriations and "advised and conspired" with the Debtor to conceal and further the misappropriations. This sort of intentionally wrongful conduct, engaged in without regard to whether the rightful owner will be harmed, easily falls within the "intentional acts" exclusion in the Cincinnati policies. The allegation that Mr. Wilson threatened to withdraw security in order to coerce the Statons likewise involves intentional conduct from which an intent to injure can be inferred. The same is true as to the claim for conversion of the cars and armaments. The basis for the claim is that Mr. Wilson, knowing that the cars and armaments belonged to the Statons, titled the vehicles in his name and had the armaments trans-

ferred to a Colombian agent for his own benefit. He then refused the demands of the Statons that the personal property be returned and held out for a $10,000.00 payment from them. The conversion claim, thus, is based upon intentionally wrongful conduct which was certain to result in a violation of the rights of the Statons and damage to them.

■ The inclusion of a purported negligence claim in the complaints does not render the intentional acts exclusion inapplicable. In *State Auto Ins. Cos. v. McClamroch*, 129 N.C.App. 214, 497 S.E.2d 439 (1998), the insurer brought a declaratory judgment action to determine whether its homeowners policy provided liability coverage to insureds who had repeatedly picketed a physician's residence as part of their pro-life activities. The physician's complaint against the insureds stated claims for private nuisance, public nuisance, intentional infliction of emotional distress, invasion of privacy, violation of the North Carolina RICO Act, and interference with civil rights, and sought monetary damages and injunctive relief. The complaint was amended to add a claim for negligent infliction of emotional distress. The court held that the policy did not provide coverage to the insureds because of the intentional acts exclusion. The court found that an intent to injure may be inferred where the act is substantially certain to result in injury. Reviewing the facts of the case, the court observed that the insureds were intentionally engaged in "targeted residential picketing with the intent of inflicting sufficient emotional distress to coerce Dr. Kaplan from engaging in the legal, though controversial, activity of performing abortions." *Id.* at 217, 497 S.E.2d at 442. The court held that an intent to injure was the only logical conclusion to be drawn from the insureds' conduct and that the claimant's addition of a

negligence claim was not sufficient to invoke coverage, stating that "[t]he Kaplans have simply 'recast their allegations of intentional conduct under a heading of negligence.'" *Id.* at 221, 497 S.E.2d at 443. Likewise, in the present case, the intentional acts exclusion is not made inapplicable as a result of the Statons recasting their earlier allegations of willful conduct under a characterization of negligent or grossly negligent misrepresentations or professional negligence.

## CONCLUSION

Based upon the foregoing, the court concludes that no coverage is provided the plaintiffs under any of the policies issued by Cincinnati as to any of the claims and damages alleged by the Statons and that Cincinnati therefore is not obligated to defend the plaintiffs in the actions brought by the Statons nor to pay any judgment obtained by the Statons against the plaintiffs in such actions. A judgment so providing will be entered contemporaneously with the filing of this memorandum opinion.

## *JUDGMENT*

For the reasons stated in the memorandum opinion filed contemporaneously with this judgment, it is ORDERED, ADJUDGED AND DECREED that the policies of insurance issued by Cincinnati Insurance Company to Jerri S. Russell (f/k/a Jerri S. Brame) do not provide any coverage as to any of the claims and damages alleged against the plaintiffs by or on behalf of Philip A. Staton, Ingeborg Staton and Mercedes Staton in the civil actions pending in the Superior Court of Forsyth County and that Cincinnati Insurance Company is not obligated under its policies to defend the plaintiffs in such civil actions nor to pay any judgments which may be

obtained against the plaintiffs in such civil actions.