# Northern Security Insurance Co. v. Rose, Steven & Kyle Perron, Susan, Gregory, Timothy & Lindsay Dube, Jesse Durenleau, Susan Durenleau Stanhope, Helene & Augustin Parah, Jr.

[777 A.2d 151]

No. 99-109

Present: **Amestoy, C.J., Morse, Johnson and Skoglund, JJ., and Jenkins, Supr. J., Specially Assigned**

Opinion Filed May 4, 2001

*Keith Aten* of *Downs Rachlin & Martin*, St. Johnsbury, for Plaintiff-Appellee.

*Christina Reiss, R. Jeffrey Behm* and *Michael Drescher* of *Sheehey Furlong Rendall & Behm, P.C.*, Burlington, for Defendants-Appellants Dube.

*Martin A. Maley* and *Kathleen A. Yarnell* of *Kissane Associates*, St. Albans, for Defendants-Appellants Stanhope, Durenleau and Parah.

**Skoglund, J.** In this declaratory judgment action, the Washington Superior Court granted summary judgment in favor of Northern Security Insurance Company (Northern Security), holding that Northern Security had no duty to defend or indemnify Rose, Steven, and Kyle Perron against claims brought by the other named defendants. The claims in the underlying action alleged that Kyle Perron, son of Rose and Steven Perron, sexually, physically and emotionally abused Timothy and Lindsay Dube (son and daughter of Susan and Gregory Dube), Jesse Durenleau (son of Susan Durenleau Stanhope), and Augustin Parah, Jr., son of Helene Parah. We affirm in part, reverse in part, and remand.

For purposes of this appeal, the relevant facts are not in dispute. Between 1984 and 1995, Rose Perron ran a day care business from her house. In May 1991, Susan and Gregory Dube entered into a contract with Rose pursuant to which, in exchange for compensation, Rose agreed to provide day care services for the Dubes' children, Timothy, then three years old, and Lindsay, then ten months old. The Perrons' son, Kyle (D.O.B. 7/21/83), was seven years old at the time.

In 1996, Susan, Gregory, Timothy, and Lindsay Dube filed suit in Franklin Superior Court against Rose, Steven, and Kyle Perron, alleging: negligent supervision of Kyle against Rose and Steven; liability under 15 V.S.A. § 901 (parents' liability for damages); intentional infliction of emotional distress (IIED) against Rose and Steven; IIED against Kyle; and breach of contract against Rose, all based on alleged abuse of Timothy and Lindsay by Kyle while in the Perrons' day care.

Prior to May 1995, Jesse Durenleau and Augustin Parah, Jr. were, on several occasions, invited to play at the Perrons' house. In 1996, Susan Durenleau Stanhope and Jesse Durenleau filed suit in Franklin Superior Court against Rose, Steven, and Kyle Perron, based on Kyle's alleged sexual assault and abuse of Jesse. The Durenleaus'[1] complaint presented counts of negligent supervision against Rose and Steven; sexual assault and false imprisonment against Kyle; IIED against Kyle; and negligence against Kyle. In 1997, Helene Parah and Augustin Parah, Jr. filed suit in Franklin Superior Court against Rose, Steven, and Kyle Perron, based on Kyle's alleged sexual assault and abuse of Augustin. Their complaint presented the same four counts as the Durenleaus' complaint, except that the named victim is Augustin Parah.

Northern Security, the Perrons' homeowner's insurance carrier, filed a declaratory judgment action in Washington Superior Court,[2] naming all of the above-mentioned parties as defendants, and asking for a ruling that the Perrons' insurance policy does not provide coverage for any of the allegations. Northern Security raised five defenses to coverage applicable to all three complaints: (1) none of the counts allege an "occurrence," and only occurrences are covered under the policy; (2) the underlying lawsuits allege injuries "expected or intended" by the insureds, and injuries that are "expected or intended" by the insured are not covered under the policy; (3) Steven and Rose breached the terms of the insurance contract by misrepresenting a material fact and making a false statement in the policy application, and thus the policy is unenforceable; (4) Rose breached the insurance contract by failing to timely notify Northern Security of the conduct alleged in the underlying complaints, and therefore the policy is unenforceable; and (5) coverage for the underlying complaints would violate public policy, as the injuries were based on Kyle's intentional acts, and it is against public policy to provide insurance coverage for an insured's own intentional conduct. Further, Northern Security raised two defenses to coverage applicable solely to the Dubes' complaint: (1) the allegations fall within the policy's business-pursuits exclusion; and

---

[1] We recognize that Susan Durenleau Stanhope does not go by the last name Durenleau. However, for purposes of simplicity, we refer to Susan Durenleau Stanhope and Jesse Durenleau as the Dureneleaus.

[2] The proceedings in Franklin Superior Court have been stayed pending resolution of the declaratory judgment action.

(2) the complaint alleges liability assumed by the Perrons under a contract, which is excluded from coverage under the policy.

Northern Security moved for partial summary judgment against the Dubes with regard to its defense concerning the business-pursuits exclusion. The Dubes filed an opposition and a cross-motion for summary judgment as to Northern Security's six remaining defenses. The Parahs and Durenleaus each filed a motion for summary judgment as to all of Northern Security's defenses except those applicable solely to the Dubes.

The court found in favor of Northern Security on summary judgment, concluding that Northern Security had no duty to defend or indemnify the Perrons against any of the allegations because the complaints did not allege an "occurrence" under the policy. In deciding the issue, the court held that the inferred-intent rule — under which intent to harm is implied in cases involving sexual abuse of a minor — applied. Therefore, the court concluded, because injuries that are expected or intended cannot be the result of an "occurrence" as defined in the policy, and because all of the claimed injuries stemmed from Kyle's alleged sexual abuse for which intent to harm would be inferred, there was no coverage under the policy for any of the insureds. The court further held that the claims of false imprisonment and assault were excluded by policy language excluding coverage for personal injury "caused by a violation of a penal law committed by an insured." Finally, with regard to the Dubes' complaint, the court concluded that, because both Dube children were at the Perrons' home for day care purposes, and because day care is a business pursuit, the policy's business-pursuits exclusion applied, and, for that independent reason, there was no coverage for any of the allegations in the Dubes' complaint. This appeal followed.

In reviewing a grant or denial of summary judgment, we apply the same standard as the trial court. "Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, after giving the benefit of all reasonable doubts and inferences to the nonmoving party." *City of Burlington v. National Union Fire Ins. Co.*, 163 Vt. 124, 127, 655 A.2d 719, 721 (1994). Because we decide that, for some of the claims, there is a fact question upon which coverage under the policy may depend, the grant of summary judgment on those claims was improper.

## I. Occurrence

As familiar as is the standard for summary judgment, so, too, are the basic rules concerning construction of insurance policy provisions. "An insurance policy must be construed according to its terms and the evident intent of the parties as expressed in the policy language. . . . Disputed terms should be read according to their plain, ordinary and popular meaning." *National Union Fire Ins. Co.*, 163 Vt. at 127-28, 655 A.2d at 721. However, "where a disputed term in an insurance policy is susceptible to two or more reasonable interpretations, the ambiguity must be resolved in favor of the insured." *City of Burlington v. Associated Elec. & Gas Ins. Servs., Ltd.*, 164 Vt. 218, 221, 669 A.2d 1181, 1183 (1995). The insurer bears the burden of showing that the claims are excluded by the policy. See *City of Burlington v. Associated Elec. & Gas Ins. Servs., Ltd.*, 170 Vt. 358, 364, 751 A.2d 284, 289 (2000).

██ In determining whether Northern Security has a duty to defend the Perrons, we must "compar[e] the allegations in the complaint of the underlying suit to the terms of coverage in the policy." *National Union Fire Ins. Co.*, 163 Vt. at 127, 655 A.2d at 721. "If any claims are potentially covered by the policy, the insurer has a duty to defend. . . . Conversely, where there is no possibility that the insurer might be obligated to indemnify, there is no duty to defend." *Id.*

The policy in this case provides personal liability coverage for claims or lawsuits "brought against an insured for damages because of bodily injury . . . caused by an occurrence."[3] "Occurrence" is defined, in relevant part, as:

> an accident, including exposure to conditions, which results, during the policy period, in:
>
> a.  bodily injury.

Section II of the policy, entitled Exclusions, states, in pertinent part:

> 1.  Coverage E — Personal Liability and Coverage F — Medical Payments to Others do not apply to bodily injury or property damage:
>
> a.  which is expected or intended by the insured.

---

[3] "Insured" is defined as "you and residents of your household who are . . . your relatives." There is no dispute that Rose, Steven, and Kyle Perron are each considered an "insured" for purposes of the policy.

As noted, in this declaratory judgment action, Northern Security argues that there is no coverage under the policy for any of the claims made, either because of the language of the policy itself or because of an exclusionary clause in the policy.[4]

Coverage under the policy is triggered by an "occurrence." If a claim is made or a suit is brought against an insured for damages because of bodily injury that is caused by an occurrence, there is coverage under the policy, unless an exclusion applies. The insurer does not deny that in the underlying action the plaintiffs have alleged that the children sustained "bodily injury." Therefore, the threshold issue of coverage in this proceeding is whether the assaults that allegedly caused the injury were an "occurrence."

A bit of history is enlightening. Prior to 1966, standard liability policy language included coverage for bodily injury or property which was "accidental." In the 1960's, revisions to the Comprehensive General Liability Policy, a standard-form policy for liability coverage, were made by representatives of the insurance industry. Instead of covering only "accidents," a word that connotes an event causing immediate or contemporaneous injury, the standard policy was written to cover "occurrences," a more expansive concept.[5] The revisions also attempted to deal with liabilities for injuries caused over a period of time; thus "occurrence" was defined, for example, as "an accident, including injurious exposure to conditions, which results in bodily injury." *Vermont Mut. Ins. Co. v. Malcolm*, 517 A.2d 800, 802 (N.H. 1986) (" 'Occurrence' thus sweeps wider than 'accident,' because 'occurrence' is defined to include an injurious exposure to continuing conditions as well as a discrete event."). The policy under consideration appears to be a variant of the standard form.

The policy at issue does not specifically define "accident." Thus, the term should be defined according to the usual understanding of the term's significance to the ordinary person. See *USAA Prop. & Cas.*

---

[4] While some courts have held that the proper construction of an insurance contract requires first a determination of whether coverage exists, and then whether an exclusion precludes coverage, *Allstate Ins. Co. v. Freeman*, 443 N.W.2d 734, 737 (Mich. 1989), in this case, we believe the better approach is to infuse the definition of "occurrence" with the policy's specific exclusion of intentional acts to determine if there is coverage under the policy. See *Mid America Fire & Marine Ins. Co. v. Smith*, 441 N.E.2d 949, 951 (Ill. App. Ct. 1982).

[5] See Wendorff, The New Standard Comprehensive General Liability Insurance Policy, ABA Section on Ins., Neg., & Comp. Law (1966 Proceedings), at 250-51; J. Tarpey, The New Comprehensive Policy: Some of the Changes, 33 Ins. Couns. J. 223, 224 (1966).

*Ins. Co. v. Rowland*, 435 S.E.2d 879, 881-82 (S.C. Ct. App. 1993) (absent prescribed definition in policy, "accident" must be defined according to ordinary and usual understanding). The South Carolina Supreme Court has interpreted the term "accident" to mean "an effect which the actor did not intend to produce and cannot be charged with the design of producing." *Goethe v. New York Life Ins. Co.*, 190 S.E. 451, 458 (S.C. 1937) (internal quotations omitted). An "accident" is generally understood to be an event that is "undesigned and unforeseen." Webster's New International Dictionary 15 (2d. ed. 1961). It is "an unexpected happening." *Associated Elec. & Gas Ins. Servs., Ltd.*, 170 Vt. at 362, 751 A.2d at 287.

In a case analyzing a policy definition of "occurrence" that is identical to the one at issue here, the New Hampshire Supreme Court wrote "the touchstone of interpretation is the definition of 'accident' as a cause of injury, as distinct from the injury itself," and selected the following definition: "[A]n accident is an undesigned contingency, . . . a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected." *Vermont Mut. Ins. Co.*, 517 A.2d at 802 (citing *Guerdon Ind., Inc. v. Fidelity & Cas. Co. of New York*, 123 N.W.2d 143, 147 (Mich. 1963) (quoting 10 R. Anderson, Couch Cyclopedia of Insurance Law § 41.6, at 27-28 (2d ed. 1962))); see also *Allstate Ins. Co. v. Freeman*, 443 N.W.2d 734, 740 (Mich. 1989).

While the courts have not agreed on many of the subtle points of interpretation in the definitions and exclusions presented in general liability insurance contracts, they have, for the most part, agreed on one point: in policies with insuring and exclusion clauses identical or similar to the ones involved here, there can be coverage for an intentional act that results in unintended injury. As recently stated by the Supreme Court of New Jersey:

> Assuming the wrongdoer subjectively intends or expects to cause some sort of injury, that intent will generally preclude coverage. If there is evidence that the extent of the injuries was improbable, however, then the court must inquire as to whether the insured subjectively intended or expected to cause that injury. Lacking that intent, the injury was "accidental" and coverage will be provided.

*SL Indus., Inc. v. American Motorists Ins. Co.*, 607 A.2d 1266, 1278 (N.J. 1992). Courts have consistently held that the term "occurrence" is inclusive not only of the commonly understood meaning of

"accident," but also of intentional actions. See *Freeman*, 443 N.W.2d at 741 ("[W]e find that ascertaining the insured's 'intent' may determine whether the insured's actions constituted an 'accident,' but it does not necessarily follow that an insured must act unintentionally for an act to be an 'occurrence.'"). The policy under consideration in *Freeman* defined "occurrence" as does the one before this Court. See also *Lyons v. Hartford Ins. Group*, 310 A.2d 485, 489 (N.J. Super. Ct. App. Div. 1973) (if insured intended to maim or kill victim he has no coverage; but if his intent was, as he says, to fire a warning shot, and he unintentionally fired prematurely, coverage exists), *overruled on other grounds by SL Indus., Inc.*, 607 A.2d at 1277-78; *Otterman v. Union Mut. Fire Ins. Co.*, 130 Vt. 636, 642, 298 A.2d 547, 551 (1972) (shooting of police officer by insured was "occurrence" under policy).

The Montana high court summarized the issue thus:

> The word "occurrence" instead of the word "accident" in the insuring clause means that the word "occurrence" is in fact broader than the word "accident" and is so intended by the insurer. In such case, the intent of the policy is to insure the acts or omissions of the insured, *including his intentional acts*, excluding only those in which the resulting injury is either expected or intended from the insured's standpoint.

> It is clear therefore, that the insured here would be debarred from coverage in those cases where his deliberate acts or assaults resulted in injuries which would be *expected or intended by him* to result from his deliberate acts. But what about coverage where the results of his acts (even though deliberate) are unexpected or not intended by the insured? The answer . . . is that (1) the event is an occurrence; (2) since it results in bodily injury it is an accident under the definition of the policy, and (3) since it is unintended or unexpected, it is within the coverage of the policy.

*Northwestern Nat'l Cas. Co. v. Phalen*, 597 P.2d 720, 724 (Mont. 1979) (emphasis in original).

This Court has had several occasions to interpret the term "occurrence" in the context of insurance policies, though not all policies being interpreted defined the term in the same language. In *Otterman*, "occurrence" was defined in the policy under consideration as "an accident . . . which results . . . in bodily injury . . . neither expected

nor intended from the standpoint of the insured." 130 Vt. at 637, 298 A.2d at 548. The facts in *Otterman* showed that the insured had no intention to cause the injury claimed when he fired a gun into a darkened building, though his act of firing the gun was intentional. The facts demonstrated that the result of the insured's shot was not expected, as he did not know the victim was even in the building. We held, therefore, that the injury resulted from an "occurrence," it being neither expected nor intended by the insured, and there was coverage under the policy. *Id.* at 642, 298 A.2d at 551. Likewise, in *State v. Glens Falls Insurance Co.*, 137 Vt. 313, 317, 404 A.2d 101, 104 (1979), which hinged on a definition of "occurrence" identical to the one found in *Otterman,* we held that the mistaken repossession of the wrong property was an "occurrence" because injury was not intended. In another case with the same policy definition of "occurrence" as in *Otterman,* we defined "accident" as an " 'unexpected happening without intention and design.' " *National Union Fire Ins. Co.*, 163 Vt. at 128, 655 A.2d at 721 (quoting *Anton v. Fidelity & Cas. Co.*, 117 Vt. 300, 305, 91 A.2d 697, 700 (1952)).[6]

In the policy at issue, the definition of "occurrence" differs from those that include the intentional acts exclusionary language within their definition of "occurrence." Here, the limiting language is found in the "Exclusion" section of the policy. Read in concert, the definition and the exclusion make it clear that if coverage is sought because of an accident that has resulted in injury that was neither expected nor intended, there is an "occurrence" and, consequently, there can be coverage.[7]

The determination of whether Kyle's alleged actions constituted an occurrence involves an inquiry into whether he expected or intended to harm the victims by his actions.[8] "[A]n insured expects an

---

[6] For a discussion of a definition of "occurrence" that we held to be broader than those under consideration here, see *City of Burlington v. Associated Elec. & Gas Ins. Servs., Ltd.*, 164 Vt. 218, 220-23, 669 A.2d 1181, 1183-84 (1995).

[7] In *Cooperative Fire Insurance Ass'n of Vermont v. Bizon*, 166 Vt. 326, 333-35, 693 A.2d 722, 727-28 (1997), we found no coverage based on the intentional act exclusion in a policy that defined "occurrence" simply as "an accident." The question of whether there had been an "occurrence" was not reached.

[8] Determining a person's expectation involves a different inquiry than does determining his or her intent. See *City of Burlington v. Associated Elec. & Gas Ins. Servs., Ltd.*, 170 Vt. 358, 363-64, 751 A.2d 284, 288 (2000); *Espinet v. Horvath*, 157 Vt. 257, 261, 597 A.2d 307, 310 (1991) (Allen, C.J., dissenting) ("[T]he inquiries into an insured's intentions and

injury if he or she is subjectively aware that injury is substantially certain to result." *Espinet v. Horvath*, 157 Vt. 257, 262, 597 A.2d 307, 310 (1991) (Allen, C.J., dissenting). Thus, if the insured did not intend to inflict the injury on the victim by his intentional act, and the act was not so inherently injurious that the injury was certain to follow from it, the act as a contributing cause of injury would be regarded as accidental and an "occurrence."

## II. Inferred Intent

Here, the court decided that there was no coverage under the policy for any insured because the "inferred intent rule" precluded a finding of an occurrence. As we explain below, this was error.

■ Whether or not an insured should expect injury from an intentional act is generally a question of fact to be determined from all the surrounding facts and circumstances. Some actions, however, are so likely to result in injury that, as a matter of law, the court will find that the injury did not result from an accident regardless of the actor's subjective intent or expectations. Under the so-called inferred-intent rule, courts conclusively presume intent to harm as a matter of law based on the nature and character of the insured's alleged acts, regardless of whether the insured asserts that he or she had no subjective intent to injure.

Ordinarily, sexual molestation of a minor by an adult falls within this category of cases. We applied the inferred-intent rule in *TBH v. Meyer*, 168 Vt. 149, 151-52, 716 A.2d 31, 33 (1998): "[F]or cases involving child sexual abuse, an insured's conduct may fall within that class of conduct that is excluded from coverage if we apply the inferred-intent rule to an insured's actions." Applying the inferred-intent rule in cases where an adult sexually abuses a minor " 'reflects our enhanced concern for the protection and well-being of minors and the gravity we attach to crimes involving the exploitation of minors.' " *Id.* at 152, 716 A.2d at 33 (quoting *State v. Searles*, 159 Vt. 525, 528, 621 A.2d 1281, 1283 (1993)).

The trial court applied the inferred-intent rule in this case, where a minor is accused of sexually abusing another minor, and held *as a matter of law* that Kyle intended to harm Jesse and Augustin by his

expectations under the terms of the policy before us . . . are not identical. If they were, the use of the word 'expected' would be mere surplusage, which is a result to be avoided in interpretation."); *Northwestern Nat'l Cas. Co. v. Phalen*, 597 P.2d 720, 725 (Mont. 1979).

actions.[9] On this holding, the court found no "occurrence" and thus, no coverage.

While an overwhelming majority of courts in other jurisdictions have applied the inferred-intent rule in cases where an adult insured sexually abused a minor, the courts are evenly split with respect to the extension of this inference to minors. See *Allstate Ins. Co. v. Patterson*, 904 F. Supp. 1270, 1282 (D. Utah 1995) (citing cases); *Country Mut. Ins. Co. v. Hagan*, 698 N.E.2d 271, 276 (Ill. App. Ct. 1998) (citing cases).

Courts that have applied the inferred-intent rule in cases where a minor is accused of sexually abusing another minor do so based on the conclusion that, because the act itself is so inherently harmful to the victim, and because subjective intent is irrelevant in cases involving adult alleged perpetrators, the age of the alleged perpetrator is irrelevant. See, e.g., *Allstate Ins. Co. v. Steele*, 74 F.3d 878, 880 (8th Cir. 1996); *State Farm Fire & Cas. Co. v. Watters*, 644 N.E.2d 492, 496 (Ill. App. Ct. 1994); *Hagan*, 698 N.E.2d at 276.

Other courts have found that, based on minors' relative lack of experience in sexual matters, it is improper to infer an intent to injure in cases where a minor sexually abuses another minor. See, e.g., *Hagan*, 698 N.E.2d at 277; *United Servs. Auto. Ass'n v. DeValencia*, 949 P.2d 525, 529 (Ariz. Ct. App. 1997). These courts generally note that criminal statutes serve to "protect minors from sexual conduct based on a presumption that they are unable to understand the nature and consequences of sexual acts." *Hagan*, 698 N.E.2d at 277. Therefore, these courts reason, if minors cannot understand the nature and consequences of sexual acts for purposes of criminal law, they cannot be presumed to understand the nature and consequences of sexual acts for purposes of civil law.

We agree with those courts that have held that the inferred-intent rule does not apply when the alleged perpetrator is a minor, and that whether a minor who molests another minor intends injury should be determined on a case-by-case basis. Our conclusion is consistent with the treatment of minors in many related contexts.

While it is difficult to imagine a predaceous youngster capable of such a thing, a child age ten can be prosecuted for sexual assault under

---

[9] To be clear, the complaint alleges that Kyle engaged in various forms of abuse, not just sexual abuse. However, for purposes of applying the inferred-intent rule, we do not "distinguish between sexual abuse and related physical and mental abuse." *Nationwide Mut. Fire Ins. Co. v. Lajoie*, 163 Vt. 619, 620, 661 A.2d 85, 86 (1995) (mem.).

our laws. See 33 V.S.A. §§ 5502(a), 5506(a)(10). However, before that child can have his or her case transferred to criminal court, the juvenile court judge must make findings concerning the child's intent, considering such factors as the maturity of the child and whether the alleged offense was committed in a premeditated or willful manner. The potential for an intention to harm is there, but every child cannot be presumed to have it.

The law also protects minors from themselves and their own poor choices. See 13 V.S.A. § 3252(a)(3) (person who engages in sexual act with person under age of sixteen guilty of sexual assault); *id.* §§ 2822-2823 (proscribing use of child in sexual performance). In *State v. Barlow*, 160 Vt. 527, 530, 630 A.2d 1299, 1301 (1993), a case that presented a challenge to 13 V.S.A. § 3252, we noted that, underlying criminal statutes that serve to protect minors from sexual conduct, is the fact that, " 'during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them.' " (quoting *Bellotti v. Baird*, 443 U.S. 622, 635 (1979)). Accordingly, the state has an "obligation to protect its children from others and from themselves." *Id.* at 528, 630 A.2d at 1300. Furthermore, in cases of statutory rape, "consent by a minor is not legally possible." *State v. Thompson*, 150 Vt. 640, 644, 556 A.2d 95, 98 (1989). This Court recently held that, where the alleged perpetrator is also a victim under the age of consent, § 3252(a)(3) is inapplicable. See *In re G.T.*, 170 Vt. 507, 518, 758 A.2d 301, 309 (2000) ("[T]he statute is intended as a shield for minors and not a sword against them.").

Thus, if minors cannot appreciate the nature and consequences of, and therefore lack the ability to consent to, sexual activity for purposes of Vermont criminal law, it would be inconsistent to hold that, for purposes of Vermont civil law, when minors engage in sexual acts, *as a matter of law*, they intend the consequences of their acts. Indeed, "courts cannot seek to protect naive [minors] on the one hand, while inferring the most degrading and unnatural thoughts to them on the other hand." *Allstate Ins. Co. v. Jack S.*, 709 F. Supp. 963, 966 (D. Nev. 1989) (holding that inferred-intent rule does not apply where a minor sexually abuses another minor); see also *Patterson*, 904 F. Supp. at 1282 ("The reason a child lacks the capacity to consent to sexual activity is because the child cannot fully appreciate the consequences of such activity. But if a child cannot fully appreciate the consequences of sexual activity, that is reason not to hold the child perpetrator to the same standard as an adult."); *DeValencia*, 949 P.2d at 529 ("It is

contradictory for the law to attribute to minors a presumptive sexual naivety on the one hand, and to presume their sexual sophistication on the other hand."). Furthermore, "it is inconsistent to rely on the age of the victim in inferring intent, yet ignore the age of the perpetrator." *Hagan*, 698 N.E.2d at 277; see also *In re G.T.*, 170 Vt. at 507, 758 A.2d at 302 (statutory rape law does not apply to minor who engaged in sexual intercourse with another minor).

Applying the inferred-intent rule to minors who engage in sexual conduct with other minors would also be inconsistent with Vermont's law on contributory and comparative negligence of minors, set forth in *Johnson's Adm'r v. Rutland R.R.*, 93 Vt. 132, 106 A. 682 (1919). There we stated that, in some cases, a child may be so young that she or he is "conclusively presumed incapable of judgment and discretion." *Id.* at 140, 106 A. at 685. In other cases, a child may be "so mature in age and intelligence that the court should say as [a] matter of law that he is capable of exercising some degree of care for his own safety under circumstances like those in question." *Id.* However, "[l]ying between these limits, necessarily undefined as to age," are the cases where the contributory and comparative negligence of a minor is a question of fact that "depends upon the circumstances of the particular case, especially the mental development and previous training and experience of the child." *Id.* Thus, Vermont law "recognizes that children do not always appreciate dangers as adults do." *Patterson*, 904 F. Supp. at 1283.

Moreover, as the Illinois appeals court noted, "extending a blanket presumption of intent to all minor perpetrators will lead to absurd results in some cases. For example, if we were to apply the inferred-intent standard to minors, a six-year-old who engages in sexual experimentation with a peer would be deemed to have intended the same injury foreseen and caused by an adult who sexually molests a child." *Hagan*, 698 N.E.2d at 277.

Finally, because the alleged perpetrator is a minor, we do not believe that the policy considerations discussed in *Meyer* are the same. There we recognized that "application of the inferred-intent rule [would deny the plaintiff] a potential source of compensation for her injuries," 168 Vt. at 154, 716 A.2d at 35, but concluded that "[e]nsuring compensation of the victim . . . is outweighed by precisely fixing both moral and economic liability on defendant." *Id.* However, "[d]epriving a minor perpetrator of insurance coverage can have little deterrent effect on a minor who likely has little understanding of the ramifications of his conduct, much less insurance coverage." *Hagan*, 698

N.E.2d at 278; see also *Patterson*, 904 F. Supp. at 1287 ("there is no evidence that the juvenile insureds even knew of the policies or of their terms").

■ We conclude, therefore, that the inferred-intent rule is inapplicable in cases where it is alleged that a minor has sexually abused another minor. Rather, the trier of fact should examine the facts and circumstances of the case before it, including the circumstances surrounding the sexual conduct, as well as the minor's "age, ability, intelligence, and experience," *Hagan*, 698 N.E.2d at 277, to determine whether the minor alleged perpetrator expected or intended his or her actions to result in harm to the victim. By declining to apply the inferred-intent standard, we do not require insurers to defend and provide coverage whenever a minor sexually abuses another minor. We merely require that the minor perpetrator's intent be determined on a case-by-case basis. Coverage will be required only when a trier of fact determines, based on the particular characteristics and experience of the minor, that the minor did not intend to injure by his actions.[10]

Therefore, the matter must be remanded for a factual inquiry and determination of whether the allegations meet the definition of "occurrence," without reliance on the inferred-intent rule.[11]

### III. Negligent Supervision

Finding no "occurrence" under the policy, the court granted summary judgment as to Northern Security on all issues presented, including the question of whether the policy provides coverage for the claim of negligent supervision brought against Kyle's parents. Because the court erred in deciding the question of whether there was an "occurrence" based on the inferred-intent rule, its finding that the claims for negligent supervision were precluded on that same reasoning must be reconsidered as well.

Count I of the Durenleau and Parah complaints allege negligent supervision of Kyle resulting in the injuries claimed.[12] Northern Secur-

---

[10] Northern Security argues, in the alternative, that there are sufficient facts in the record to enable us to find that Kyle intended to harm Jesse and Augustin. Because the trial court was deciding a summary judgment motion, it made no findings regarding Kyle's intent. We will not engage in appellate fact finding.

[11] The resolution of the question of Kyle's intentions will also determine if the negligence claim against Kyle in Count 4 of the Durenleau and Parah complaints is a true negligence claim or an attempt to circumvent the intentional exclusion of the policy. See *Lajoie*, 163 Vt. at 620, 661 A.2d at 86.

[12] Because of our holding on the Dube complaint, see section IV of this opinion, we discuss

ity posits that in analyzing whether the complaint alleges an occurrence in Count I, it is Kyle's alleged abuse, not the alleged negligent supervision of his parents, that controls. The Durenleaus and the Parahs argue that the policy, by its terms, "applies separately to each insured," pointing to the language of the intentional acts exclusion of the policy which denies coverage for bodily injury "which is expected or intended by *the* insured." (Emphasis added.) Accordingly, they argue, even if this exclusion is found to bar coverage for Kyle, it does not bar coverage for the claims of negligent supervision against his parents. On this issue, we agree with the Durenleaus and the Parahs.

Northern Security argues that courts draw a distinction between the immediate circumstances which inflict bodily injury and the antecedent negligence which sets in motion a chain of events leading to that injury, see *Maples v. Aetna Cas. & Sur. Co.*, 148 Cal. Rptr. 80, 84 (Ct. App. 1978) ("the term 'accident' unambiguously refers to the event causing damage, not the earlier event creating the potential for future injury"), and that courts consistently hold that it is the underlying cause of the claimed injury that determines coverage. For example, in *Steele*, the Eighth Circuit Court of Appeals upheld a lower court's grant of summary judgment to the insurer in a case alleging wrongful sexual contact between children, finding that rape of a twelve-year-old girl by her sixteen-year-old stepbrother was an intentional act and, further, that claim of negligent supervision against the parents was not covered due to the policy's joint obligations provision. 74 F.3d at 880-81. The court further noted that, even if the joint obligations clause did not bar claims, other policy language precluded recovery for negligent supervision, noting that the policy did not cover damages "resulting from" intentional misconduct. The court reasoned that, even if it was assumed that the parents failed to supervise their son adequately, plaintiffs would not have been injured but for the son's intentional misconduct. The court held that the plaintiff "cannot circumvent the policy's intentional conduct exclusion by suing the Steeles for negligent supervision." *Id.* at 881. Northern Security also cites *American Empire Surplus Lines Ins. Co. v. Bay Area Cab Lease, Inc.*, 756 F. Supp. 1287, 1289-90 (N.D. Cal. 1991) (no coverage for claim of negligent hiring against employer of molester; hiring of molester "merely created the potential for injury . . . but was not itself the

---

the parental negligence claims in light of the allegations in the Durenleau and Parah complaints only.

cause of the injury"); *Mutual of Enumclaw v. Wilcox*, 843 P.2d 154, 159 (Idaho 1992) (in complaint against wife alleging failure to warn of husband's propensity to molest children, wife's conduct was "not an 'occurrence' under the policies because it was not the conduct which caused injury. The injury suffered by the minors is child molestation."); and *Farmers Alliance Mut. Ins. Co. v. Salazar*, 77 F.3d 1291, 1296-97 (10th Cir. 1996) (in determining no coverage for claim of negligent supervision against woman whose son committed murder, court stated that "[t]hough myriad other events of an earlier time and different place may have contributed to the claimed injury, to determine whether there was an 'occurrence' within the meaning of the policy we must focus on those events directly responsible for the injury").

However, in none of the cases cited in support of Northern Security's position do the courts analyze the issue under policy language as presented in the intentional acts exclusion in the case at bar.

The policy's exclusion of bodily injury "expected or intended by *the* insured" is standard language that has been included in the standard-form comprehensive general liability policies since the mid-1960's revisions. Courts construing similar policy language have concluded that, when a provision uses the article "the," the provision applies only to claims brought against the particular insured named in the claim.[13] Conversely, when the exclusionary language refers to intentional acts of "*an* insured," courts have uniformly concluded that the exclusion applies to all claims which arise from the intentional acts of any one insured, even though the claims are stated against another insured.[14]

For example, in *Unigard Mutual Insurance Co. v. Argonaut Insurance Co.*, 579 P.2d 1015 (Wash. Ct. App. 1978), a boy intentionally set fire to trash in a wastebasket in a school building, and the school district sued his parents for negligence. The parents' policy excluded coverage for bodily injury or property damage "expected or intended from the standpoint of *the insured.*" *Id.* at 1017 (emphasis in original). The court noted that, where the policy provision refers to *the*

---

[13] See, e.g., *McBride v. Lyles*, 303 So. 2d 795 (La. Ct. App. 1974); *Pawtucket Mut. Ins. Co. v. Lebrecht*, 190 A.2d 420 (N.H. 1963); *Sunshine Birds & Supplies, Inc. v. United States Fid. & Guar. Co.*, 696 So. 2d 907 (Fla. Dist. Ct. App. 1997).

[14] See, e.g., *Allstate Ins. Co. v. Gilbert*, 852 F.2d 449 (9th Cir. 1988); *Travelers Ins. Co. v. Blanchard*, 431 So. 2d 913 (La. Ct. App. 1983); *Allstate Ins. Co. v. Jordan*, 16 S.W.3d 777 (Tenn. Ct. App. 1999); *Johnson v. Allstate Ins. Co.*, No. Civ. 95-151-P-H, 1996 WL 66231 (D. Me. Jan. 26, 1996).

*insured*, as opposed to *an insured*, "the courts have uniformly considered the contract between the insurer and several insureds to be separable, rather than joint, *i. e.*, there are separate contracts with each of the insureds. The result is that an excluded act of one insured does not bar coverage for additional insureds who have not engaged in the excluded conduct." *Id.* at 1019. Thus, the *Unigard* court held that, although the boy's intentional act would be excluded from coverage, the insurer was still obligated to defend the boy's parents against the negligence claims. See *id.*; see also *Pawtucket Mut. Ins. Co. v. Lebrecht*, 190 A.2d 420, 422-23 (N.H. 1963) (policy provision "excluding from liability coverage injuries intentionally caused by 'the Insured' was meant to refer to a definite, specific insured, namely the insured who is involved in the occurrence which caused the injury and who is seeking coverage under the policy"; thus, policy provided coverage for claim against parents for negligent supervision of son who committed intentional assault); *Allstate Ins. Co. v. Roelfs*, 698 F. Supp. 815, 822 (D. Alaska 1987) (where policy excluded coverage for bodily injury intentionally caused by "an insured," court held "if the claims arise from bodily injury intentionally caused by any one insured, all claims are excluded, regardless of whether they are stated against a different insured for unintentional conduct"); *Freeman*, 443 N.W.2d at 752 (concluding that, had policy's intentional-acts exclusion referred to "the insured," exclusion would only apply to "intentional acts of that particular insured," but because exclusion referred to "an insured," insurer " 'unambiguously excluded coverage for damages caused by the intentional wrongful act of *any* insured under the policies' ") (quoting *Allstate Ins. Co. v. Gilbert*, 852 F.2d 449, 454 (9th Cir. 1988)).

■ Had the intentional-acts exclusion at issue excluded coverage for bodily injury expected or intended by *an* insured, and not, as here, *the* insured, the act relevant to determining if the policy provided coverage would be Kyle's alleged sexual and physical abuse, and not Rose and Steven's alleged negligent supervision. If no coverage was found for Kyle's actions, there would be no coverage for any allegations against Rose and Steven for negligent supervision.[15] However, the policy at

---

[15] In *Mailhiot v. Nationwide Mutual Fire Insurance Co.*, 169 Vt. 498, 740 A.2d 360 (1999), this Court considered whether to apply the concurrent causation doctrine adopted in *State Farm Mutual Automobile Insurance Co. v. Roberts*, 166 Vt. 452, 697 A.2d 667 (1997), to the facts of the case and decided that the claim against parents for negligent supervision of their son could not be separated from the son's conduct, for which there was no coverage because of the policy's automobile exclusion. We note that the exclusion

issue herein excludes coverage for intentional acts of *the* insured. Therefore, any exclusion of Kyle from coverage would not affect coverage for the claims against the other insureds.

Indeed, had Northern Security "intended that the wrongful act of *any* insured would void the policy, it could have unambiguously drafted and included such language in the contract." *American States Ins. Co. v. Borbor*, 826 F.2d 888, 894 (9th Cir. 1987) (emphasis in original).

### IV. The Business-Pursuits Exclusion

It is not made clear in the trial court decision why, having found no "occurrence" under the contract language, the court went on to consider the applicability of the policy's business-pursuits exclusion or the exclusion for injuries caused by a violation of a penal law. Nevertheless, as explained below, we affirm the court's decision that the business-pursuits exclusion relieves Northern Security of any obligation under the contract to defend against the Dubes' complaint, notwithstanding our remand for determination of whether there has been an "occurrence." The affirmance on this point will limit the issues to be considered on remand.

■ Count I of the Dubes' complaint alleged that Rose and Steven Perron had, and breached, a duty of care to protect Timothy and Lindsay from harm, and Count II alleged that they had, and breached, a duty to exercise reasonable care in supervising their son to ensure that he did not harm Timothy and Lindsay. Northern Security argues that the policy exclusion for injuries arising out of the insured's business pursuits precludes coverage. Section II of the policy, the exclusions section, states, in pertinent part:

> 1.  Coverage E — Personal Liability and Coverage F — Medical Payments to Others do not apply to bodily injury or property damage:
>
> . . . .
>
> b.  arising out of or in connection with a business engaged in by an insured. This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance,

---

of coverage for "bodily injury . . . arising out of the ownership, . . . or use of . . . a motor vehicle owned or operated by, or rented or loaned to *an* insured" (emphasis added), would preclude coverage for the parents in any event under our holding herein. *Id.* at 499-500, 740 A.2d at 361.

involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the business.

This exclusion does not apply to:

(1) activities which are usual to non-business pursuits . . . .

The policy also explicitly provides that the home day care enterprise is considered a business pursuit. At the time they were allegedly injured, Timothy and Lindsay were at the Perrons' house for day care purposes. Thus, their claim for damages arose out of the insured's day care business, and the business-pursuits exclusion applies.

█ The Dubes contend that, if the business-pursuits exclusion applies, the exception, for "activities which are usual to non-business pursuits," applies as well, as supervision of one's own children is an activity usual to nonbusiness pursuits. Therefore, according to the Dubes, the policy provides coverage for Count II. We disagree.

We had occasion recently to decide another case where the business-pursuits exclusion in a homeowner's policy controlled. In *Luneau v. Peerless Insurance Co.*, 170 Vt. 442, 750 A.2d 1031 (2000), the insured, who was employed as a disc jockey at a wedding reception, became involved in a fight with a wedding guest and, as a result, a speaker fell and struck the plaintiff, a bystander. The resulting lawsuit alleged that the disc jockey was negligent in his placement of the speaker and fighting with the guest. The insurer sought summary judgment, arguing that the injury was excluded from the policy as a matter of law. We held that the business-pursuits exclusion applied, and that the exception to the exclusion did not, because the relevant activity was not the fight or the knocking over of the speaker; rather, it was the disc jockey's failure to create a safe space for his customers. See *id.* at 449, 750 A.2d at 1036.

In *Luneau* we adopted the analysis articulated in *Stanley v. American Fire & Casualty Co.*, 361 So. 2d 1030 (Ala. 1978). *Id.* There, a child attending a day care fell into a fireplace and suffered injuries while the day care provider was making lunch for herself, her own child, and the children attending the day care. The *Stanley* court held that the business-pursuits exclusion applied, but the exception did not apply. According to the court, for purposes of analyzing the exception, the relevant activity was not preparing lunch, but rather, the day care provider's failure to supervise. Because the day care provider's failure to supervise was not an activity usual to nonbusiness pursuits, the exception to the exclusion did not apply. See *Stanley*, 361 So. 2d at 1032.

Thus, while parents generally have a responsibility to supervise their children regardless of whether they are operating a day care, here the Perrons allowed their son to interact with the children attending the day care. The Perrons' duty to supervise their own children was encompassed within their duty to ensure the safety of Timothy and Lindsay Dube. See *Safeco Ins. Co. v. Howard*, 782 S.W.2d 658, 659-60 (Mo. Ct. App. 1989) (day care provider's failure to supervise her own son, who sexually molested children attending the day care, "was not ordinarily incident to non-business pursuits," and therefore coverage was denied); *American Family Mut. Ins. Co. v. Moore*, 912 S.W.2d 531, 535-36 (Mo. Ct. App. 1995) ("Owning or harboring a dog may be an activity usually incident to a non-business pursuit, but the policy exception focuses on the activity which caused the injury. The dog was kept in the home while childcare services were being performed. The introduction of the dog with vicious propensities into the babysitting environment and in close proximity to small children, who were on the premises pursuant to a business pursuit, cannot be said to be an activity incident to a non-business pursuit."). As we stated in *Luneau*:

> "The business of child care contemplates the exercising of due care to safeguard a child of tender years from household conditions and activities; and, any activity of the insured in this regard from which injury results cannot logically be called an activity ordinarily incidental to a non-business pursuit."

*Luneau*, 170 Vt. at 447, 750 A.2d at 1034-35 (quoting *Stanley*, 361 So. 2d at 1032). See also *Moncivais v. Farm Bureau Mut. Ins. Co.*, 430 N.W.2d 438, 442 (Iowa 1988) ("Maintaining proper supervision and a safe environment for children are basic elements of a child day care operation."); *Farmers Ins. Co. of Ariz. v. Wiechnick*, 801 P.2d 501, 504 (Ariz. Ct. App. 1990) ("[M]aintaining proper supervision and a safe environment for children is the most basic element of a babysitter's job."). Therefore, with regard to Count II, the business-pursuits exclusion, but not the exception, applies.

Because all of the allegations in the Dube complaint arise from the Perrons' provision of home day care services, and because the policy does not cover bodily injury arising out of a home day care enterprise, Northern Security is not obligated to defend or indemnify the Perrons against the claims of the Dubes. See *National Union Fire Ins. Co.*, 163

Vt. at 127, 655 A.2d at 721 (where there is no duty to indemnify, there is no duty to defend).

## V. The Penal Act Exclusion

The court also determined that coverage would be denied for all claims based on the language of the policy exclusion for "injuries caused by a violation of a penal law . . . committed by or with the knowledge or consent of an insured." Based on this language, the court concluded that Northern Security was not obligated to defend or indemnify the Perrons against the claim of negligent supervision because Kyle's "intended actions which violated the penal code preclude coverage for the negligence claims against his parents." Interestingly, on this issue, the court relied for its holding on cases distinguishing language in policies excluding coverage for "bodily injury . . . intentionally caused by *an* insured" (emphasis added) from policies excluding coverage for injuries intentionally caused by *the* insured. As discussed previously, we agree that the choice of the article "an" rather than "the" would preclude coverage for negligent supervision premised on an injury caused by a violation of a penal law by "an" insured or "any" insured or "a" insured. See *Patterson*, 904 F. Supp. at 1287-89 (Allstate not entitled to summary judgment on issue of coverage for parents facing complaint of negligent supervision of their sons who allegedly sexually abused plaintiff's sons. Criminal act exclusion of policy contained the "an insured person" language on which Allstate's argument was based. Court remanded the matter for determination of the juveniles intent and whether the juveniles had the requisite mental state for a crime.).

The court, however, started from a flawed premise — the record shows no violation of a penal law. It is not clear from the record before us whether any petition was filed in juvenile court against Kyle or whether Kyle was actually adjudicated a delinquent. There is nothing in the record to show that Kyle was convicted of a crime arising out of the incidents at issue in this case. Assuming, for purposes of argument, that there was an adjudication of delinquency, the superior court incorrectly concluded that his actions violated the penal code. Under Vermont law, a juvenile delinquency adjudication is not a violation of penal law. See 33 V.S.A. §§ 5535(a) ("[a]n order of the juvenile court in proceedings under this chapter shall not be deemed a conviction of crime"); 5501(a)(2) (purpose of juvenile proceedings is "to remove from children committing delinquent acts the taint of criminality and the consequences of criminal behavior and to provide a program of

treatment, training, and rehabilitation consistent with the protection of the public interest"); *In re R.S.*, 143 Vt. 565, 571, 469 A.2d 751, 755 (1983) ("[p]roceedings under the Juvenile Procedure Act are protective, not penal"); *In re Rich*, 125 Vt. 373, 375, 216 A.2d 266, 267-68 (1965) (juvenile proceeding "is a protective proceeding entirely concerned with the welfare of the child, and is not punitive. . . . The inquiry relates to proper custody for the child, not his guilt or innocence as a criminal offender."); *In re Hook*, 95 Vt. 497, 499, 115 A. 730, 731 (1922) (juvenile proceeding "is not penal, but protective").

On the record before us, then, the exclusion for injury caused by a violation of a penal law does not apply.

■ Next, Northern Security argues that the insurance policy is void because, when applying for homeowner's insurance, the Perrons stated that they were not conducting business pursuits on the premises. Our decision on the business-pursuit exclusion renders this argument moot as to the Dubes. However, the Durenleaus and Parahs note that the superior court made no factual findings, and the facts are in dispute, on this issue. Thus, the Durenleaus and Parahs argue, the issue is inappropriate for summary judgment. We agree.

Finally, Northern Security argues that the Perrons did not provide Northern Security with timely notice of the lawsuits, as required by the policy. However, Northern Security did not raise this issue below, and it is therefore waived on appeal. See *Myers v. Langlois*, 168 Vt. 432, 439, 721 A.2d 129, 133 (1998) (failure to raise claim before trial court precludes this Court from hearing the claim on appeal).

### Summary

With regard to the Dubes' complaint, because there are no genuine issues of material fact and Northern Security is entitled to judgment as a matter of law, we affirm the superior court's grant of summary judgment to Northern Security. Northern Security has no duty to defend or indemnify the Perrons with regard to the Dubes' complaint.

However, with regard to both the Durenleaus' and Parahs' complaints, because there are genuine issues of material fact, we reverse the superior court's grant of summary judgment to Northern Security.

*Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.*