2006 VT 126

**WATERBURY FEED COMPANY, LLC v. Carol O'NEIL**

[915 A.2d 759]

No. 05-268

¶ 1. November 20, 2006. Tenant, Waterbury Feed Company, LLC, appeals from a judgment in favor of landlord, Carol O'Neil. Following a bench trial, the Washington Superior Court denied all of tenant's claims, awarded landlord damages for unpaid rent, and granted possession of the disputed commercial leasehold to landlord. On appeal, tenant contests the superior court's denial of its claims regarding landlord's obligations: (1) to pay a portion of propane costs; (2) to pay a portion of mowing and plowing costs; (3) to maintain the roof and foundation to prevent heat loss; (4) to install a patio; and (5) not to unreasonably withhold its consent to assignment of the lease. We affirm in part, reverse in part, and remand for further consideration.

¶ 2. Following are the basic facts. Additional facts are described in the context of each of tenant's claims of error. In October 1998, the parties entered into an agreement for tenant to lease a portion of landlord's building, an old grist mill, for the purpose of opening and operating a restaurant. The lease entitled tenant to occupy 44.3% of the square footage of the building, including the basement and portions of the first and second floors. Additionally, the lease allowed tenant use of a stream-side area, overlooking a waterfall, where landlord was obligated to provide a level grade. The lease was for an initial five-year term, with options for three additional five-year terms. The original lease required tenant to pay 44.3% of certain costs, including snow removal, mowing and heating fuel, among others. The lease also required landlord to make certain improvements to the building to prevent heat loss.

¶ 3. Throughout the almost six years tenant leased this space, the parties were in dispute about several obligations under the lease. Landlord complained that tenant did not pay rent on time and failed to pay rental increases, while tenant complained that landlord did not complete improvements as stipulated in the lease. In an attempt to rectify some of the concerns, in April 2000, the parties executed an addendum to the lease. This addendum required landlord to install a patio by May 31, 2000, make certain improvements to the property, and cooperate with solutions identified by an energy audit. Unfortunately, this addendum did not resolve the ongoing issues. Landlord never constructed the patio and the heat-loss problems and heat-cost allocation were never resolved to tenant's satisfaction.

¶ 4. On July 17, 2003, tenant filed a complaint seeking damages on several grounds. Landlord counterclaimed for eviction and unpaid and underpaid rent. The trial court ruled against tenant on all claims, granted possession to landlord, and ordered tenant to pay $22,283.43 in underpaid and unpaid rent.

¶ 5. On appeal, tenant claims that it is entitled to damages because landlord: (1) did not honor the lease's cost-sharing provision with regard to heating fuel; (2) did not pay its share of mowing and plowing costs; (3) did not properly fix and maintain the premises; (4) failed to con-

struct a patio; and (5) unreasonably refused to consent to assignment of the lease. These claims are addressed in turn.

¶ 6. We defer to the trial court's findings unless they are clearly erroneous, and we uphold the trial court's conclusions as long as they are reasonably supported by the findings. *Bull v. Pinkham Eng'g Assocs.*, 170 Vt. 450, 454, 752 A.2d 26, 30 (2000). We review findings in the light most favorable to the judgment, disregarding modifying evidence. *Id.* ("Findings ... will not be disturbed merely because they are contradicted by substantial evidence; rather, an appellant must show that there is no credible evidence to support them.").

## I.

¶ 7. Tenant first claims that landlord breached the lease by failing to pay a portion of heating fuel costs, and demands 55.7% of its propane expenses. The lease provides, in relevant part:

> Lessor represents that the total square footage of the Premises is equal to 44.3% of the total square footage of the Building .... Accordingly, Lessee covenants and agrees that, in addition to the Base Rent, Lessee shall pay Lessor 44.3% of the following costs: municipal sewer charges consisting of municipal water charges, snow removal, mowing and heating fuel.... Lessor shall deliver to Lessee monthly itemized statements and calculations setting forth the. amount that Lessee owes pursuant to this Section, and within fifteen (15) days thereafter Lessee shall pay the same to Lessor.

The trial court found that this provision was never followed with regard to heat-ing fuel. Instead, after consulting with landlord, tenant contracted directly with a propane` service. During the brief period when there were other tenants in the building, those tenants paid a pro rata share directly to tenant's account with the propane supplier. Tenant paid the entire propane bill at all other times. Thus, when tenant was the building's sole tenant, it paid for all of the heat. When other parties were using the single boiler, other parties contributed to heating costs. Based on these findings, the trial court concluded that tenant had waived its right to contribution from landlord.

¶ 8. The trial court held that the purpose of the cost-sharing provision was to ensure that tenant would only pay for the propane it used to heat its portion of the building, and that an implicit assumption was that the building would be fully rented before the provision applied. Additionally, the court held that the parties' long-standing, shared departure-from the specific terms of this provision constituted a waiver so that landlord did not breach the lease by failing to contribute to propane costs.

¶ 9. "A waiver is a voluntary relinquishment of a known right, and can be express or implied." *Anderson v. Cooperative Ins. Cos.*, 2006 VT 1, ¶ 10, 179 Vt. 288, 895 A.2d 115 (citations omitted). To show an implied waiver, landlord would have to show that she honestly and reasonably believed, based on tenant's conduct, that tenant would forgo asserting some right to which it was otherwise entitled, and that landlord detrimentally relied on that belief. *Id.* ¶ 11.

¶ 10. The trial court found that tenant made separate arrangements for fuel on its own and not due to any failure on landlord's part to provide propane. This finding is supported by the testimony at trial and we will not disturb it. *Bull*, 170 Vt. at 454, 752 A.2d at 30; *Lawrence v.*

*Pelletier,* 154 Vt. 29, 33, 572 A.2d 936, 939 (1990) (emphasizing that credibility is a matter "accorded to the exclusive determination of the trier of fact"). We do not agree, however, that the court's findings support its conclusion that tenant impliedly waived its right to contribution from landlord for heating fuel costs. *Bull,* 170 Vt. at 454, 752 A.2d at 30 (explaining that conclusions will be upheld if reasonably supported by the findings).

¶ 11. Although landlord and tenant diverged from the lease language in practice, an implied waiver requires more. Landlord must demonstrate that she honestly believed tenant would forgo asserting its right to contribution for propane costs and that she acted to her detriment in reliance on that belief. *Anderson,* 2006 VT 1, ¶ 11. In this case, tenant's actions do not support a finding that tenant intended to forgo landlord's obligation to pay for part of the propane costs. Tenant sent landlord a letter on August 8, 2001, demanding payment for "common area" charges for heat, water, sewer, snow plowing, and lawn care. In an attached cost summary, tenant requested five percent of its propane fuel costs for common areas. This affirmative act, although it came two years after the lease began, evidenced tenant's desire for landlord to contribute to fuel costs.

¶ 12. In addition, even if landlord believed that tenant was forgoing its right to contribution, there is no evidence that landlord acted to her detriment in reliance on that belief. There can be no implied waiver without detrimental reliance. *Id.* The evidence is undisputed that landlord did not contribute to fuel costs at any time. Without a valid waiver, this failure was a breach.

¶ 13. We are reluctant, however, to make any definitive ruling on this issue because the facts in the record and the court's related findings are limited. See *N. Sec. Ins. Co. v. Perron,* 172 Vt. 204,

218 n.10, 777 A.2d 151, 161 n.10 (2001) (limiting appellate review to facts in record). The court made no findings concerning whether landlord acted in detrimental reliance or whether tenant's August 8, 2001 letter constituted an express waiver of all but five percent of the fuel costs. See *Cooley Corp. v. Champlain Valley Union High School Dist. #15,* 144 Vt. 341, 344, 477 A.2d 624, 626 (1984) (explaining that appellate court will not engage in fact finding). Thus, we remand for the trial court to consider the evidence and, based on the evidence introduced at trial, make findings on whether there was an express or implied waiver. If the trial court finds that there was no waiver, it should assess a damage award.[1]

## II.

¶ 14. Under the same cost-sharing provision, tenant seeks damages for overpayment of mowing and plowing expenses. The lease required tenant to pay 44.3% of all mowing and plowing costs. The trial court held that the parties disregarded the language of the lease regarding cost allocation and that both parties paid for some costs. The court found that there was insufficient evidence to demonstrate that landlord breached the lease by failing to reimburse tenant for its mowing and plowing costs. The record supports the trial

---

[1] Our ruling would not preclude tenant from advancing a quasi-contractual claim for return of the additional benefit it conferred on landlord by heating common areas. *In re Estate of Elliott,* 149 Vt. 248, 252, 542 A.2d 282, 285 (1988). The trial court addressed this claim, however, and ruled that tenant failed to present reliable evidence concerning the amount of benefit conferred on landlord. Tenant does not appeal this ruling, thus we do not address it.

court's finding that both parties contributed to mowing and plowing costs. *Bull*, 170 Vt. at 454, 752 A.2d at 30 (findings will be upheld unless clearly erroneous). These findings in turn support the court's conclusion that tenant did not carry its burden of demonstrating that it paid more than its contractual share. Therefore, we affirm the trial court's denial of damages for overpayment of mowing and plowing costs.

## III.

¶ 15. Tenant next claims that the trial court erred by refusing to award damages for landlord's failure to properly fix and maintain the premises to prevent heat loss. The trial court held that landlord did not breach its maintenance obligations under the lease and later addendum. The 1998 lease required landlord, generally, to "make all structural repairs and maintain in good condition and make all repairs to ... heating and air-conditioning facilities, including but not limited to the roof." In addition, exhibit C of the lease obligated landlord to make a number of specific improvements, including insulating the ceilings above each floor rented by tenant, installing a poured slab in the basement and insulating beneath it, installing radiant heat, and insulating cracks in the stonework with foam. In the April 2000 addendum, the parties agreed to split the cost of an energy audit and to "cooperate in good faith on reasonable additional solutions to problems identified by the audit." That audit identified the two primary sources of the heat loss as the fieldstone foundation and the stairway leading up to the second floor from the entrance foyer; secondary sources were the commercial range hood, gaps around second floor window casings, and the boiler.

¶ 16. Tenant asserts that landlord failed to properly repair the mill foundation because it was "chinked ... only a couple of times, which was insufficient to keep the cold from pouring through the foundation." The 1999 energy audit determined that the foundation contributed to the heat loss from both cracks in the stonework and its "negligible insulating value." The audit was also clear that chinking would address the leakage but not the inherent "conductive losses" and that entirely insulating the wall would be the "more energy effective approach." The 2000 lease addendum obligated landlord to "re-point the joints between the stones on the ... foundation walls," and the trial court found that landlord's son, a stone mason, repointed the stones each year. The parties chose not to employ the second recommendation to entirely insulate the walls, both agreeing that although the foundation was a source of heat loss, it was also a part of the building's charm. As the trial court noted, tenant rented an old building with known heat-loss issues. It contracted to limit its exposure to these problems, but it did not contract to eliminate them. We agree with the trial court that tenant failed to demonstrate landlord's breach.

¶ 17. In addition, tenant submits that landlord was in breach because the "roof was both uninsulated and open to the elements due to neglect." Based on testimony at trial, the trial court acknowledged that "the roof is in poor repair," with "gaps in it, rendering sky visible from the interior." The court concluded that these deficiencies did not amount to breach. The court reasoned that although this "would be an issue for the top floor or attic tenant," tenant's space was unaffected as it occupied the bottom floors and was essentially uninsulated anyway.

¶ 18. We agree that landlord's failure to insulate the roof did not constitute a breach. Neither the lease nor the addendum required landlord to insulate the roof, and no such duty can be derived from landlord's general duty to fix and

maintain the premises. As the trial court pointed out, tenant knew it was renting an old building.

¶ 19. On the other hand, landlord did have an obligation to "maintain [the building] in good condition and make all repairs to ... the roof." Tenant contracted for a roof maintained in good condition. Given the trial court's findings that the roof had gaps in it, we conclude that landlord's failure to repair such gaps constituted a breach.

¶ 20. We agree with the trial court, however, that tenant failed to demonstrate that such gaps adversely affected its space. Tenant did not provide evidence as to how it was harmed. The energy audit did not mention the damaged roof as a source of heat loss. Further, the bulk of tenant's space was three levels and three insulated ceilings below the faulty roof. Therefore, we find only nominal damages appropriate and instruct the trial court to award such damages on remand. See *Doria v. Univ. of Vt.*, 156 Vt. 114, 119, 589 A.2d 317, 319 (1991) (explaining that nominal damages are appropriate where "there has been an invasion of a right, yet no actual damage occurred").

IV.

¶ 21. Tenant next claims that it is entitled to damages for landlord's failure to construct the patio. The trial court concluded that construction of the patio became impracticable and discharged landlord's obligation to build it. According to the trial court, construction was initially impracticable due to a flood, later because of the need to wait for a state permit and a blasting company, and finally because tenant had not fully met its payment obligations. Moreover, the trial court noted that even if landlord did breach the agreement, tenant "wholly failed to prove damages." We disagree with the trial court on this point and

conclude that the trial court's findings support the conclusion that landlord did breach its obligation to construct a patio and remand for calculation of damages.

¶ 22. The lease expressly gave tenant "the right to use the patio stream side area at the basement level." The April 2000 addendum obligated landlord to, among other things, construct a patio by May 31, 2000.[2] Before that date, at about the time landlord was to begin construction of the patio, the adjacent stream flooded. To prevent additional flooding, landlord had to obtain a state stream-alteration permit and wait for a specialist to blast the rocks causing the flooding problem. The blasting did not occur until November 2002. No evidence suggested that landlord unreasonably or unnecessarily waited for a particular blasting specialist. By the time a specialist was available, landlord had "reached the conclusion that tenant was in violation of the lease, and therefore did not want to proceed with patio construction."

¶ 23. On this issue, the trial court found the following:

> There is no question the patio would have been an important business amenity for Tenant. Restaurant patrons enjoy the option of eating outside in fine weather. Tenant has lost gross sales for lack of the patio. As with other parts of Tenant's evidentiary presentation, the amount of such lost sales appeared exaggerated. For exam-

---

[2] Tenant seeks compensation for landlord's failure to construct the patio from the date of the original lease, yet concedes that the parties resolved that dispute with the 2000 addendum, so we consider tenant's claim only from the date of the addendum forward.

ple, it is probable that fewer than 30 patrons would have been seated on the relatively small patio. Tenant did not ever actually measure the likely dimensions of the envisioned patio. Tenant did not take into account large boulders that would have affected both its actual and useful size.

The court concluded that landlord owed no damages because construction of the patio was rendered impracticable, and "[i]n any event, even if we were to conclude that Landlord's failure to complete the patio breached the lease, Tenant wholly failed to prove damages."

¶ 24. First, we address the court's conclusion that landlord was discharged of her responsibility to complete the patio due to impracticability. A party may defend against a contract action by demonstrating that its performance under the contract is "impracticable." Restatement (Second) of Contracts § 261 (1981). "Performance may be impracticable because extreme and unreasonable difficulty, expense, injury, or loss to one of the parties will be involved." *Id.* cmt. d. Our cases have applied this principle narrowly so that the impossibility "must consist in the nature of the thing to be done and not in the inability of the party to do it." *Agway, Inc. v. Marotti*, 149 Vt. 191, 193, 540 A.2d 1044, 1046 (1988) (quotation omitted). Landlord did not carry her burden of demonstrating that installing a patio in the stream-side area was impracticable "because of a fact of which [she] ha[d] no reason to know and the nonexistence of which [was] a basic assumption on which the contract was made." *Id.* Although installation was temporarily impracticable for a period of time before the November 2002 blasting, after that date landlord was simply unwilling to complete it. Thus, landlord was not absolved of her responsibility to complete the patio, and her failure to do so constituted breach.

¶ 25. Next, we address the trial court's conclusion that regardless of whether landlord breached the lease, tenant failed to prove damages. The evidence does not support this finding. Although the evidence of damages was not detailed, there was testimony concerning the effect of an incomplete patio. Generally, in a breach of contract case there are two types of damages: direct damages that "naturally and usually flow from the breach itself," and special or consequential damages, which must pass the tests of causation, certainty and foreseeability. *A. Brown, Inc. v. Vt. Justin Corp.*, 148 Vt. 192, 196, 531 A.2d 899, 901-02 (1987). Consequential damages must have been in the contemplation of the parties at the time they made the contract. *Id.*

¶ 26. At trial, tenant's principal testified that landlord's failure to complete the patio caused damages, which could be calculated either through lost space or lost business. Tenant testified that part of its rent was for access and use of the patio, and estimated the price of this lost space. Alternatively, tenant calculated damages based on business the restaurant lost because there was no patio.

¶ 27. The trial court agreed that tenant had lost sales because it could not offer its customers a patio, but refused to award any damages because the amounts tenant offered appeared exaggerated. Our cases have not required claimants to present precise figures of damages. See *id.* at 196, 531 A.2d at 902 (explaining that damages may be given in approximate amounts). We have noted that, where damage calculations are based on approximations or estimates not supported by documentation, such shortcomings do not negate them as evidence, but may impact their weight as evidence. *Id.* at 196-97, 531 A.2d at 902; see also *Tour Costa Rica v. Country Walkers,*

*Inc.*, 171 Vt. 116, 127, 758 A.2d 795, 804 (2000). On remand, we instruct the trial court to consider tenant's testimony on damages, as well as landlord's response, make findings as to the credibility of the evidence, and calculate a damage award, if appropriate.

## V.

¶ 28. Lastly, tenant claims that the trial court erred in concluding that landlord did not breach the lease's assignment clause. The trial court held that because tenant never submitted a proposed assignment in compliance with the assignment clause, it was unable to conclude that landlord improperly refused to assent to the lease assignment. We affirm.

¶ 29. The lease's assignment clause states "[tenant] will not . . . assign . . . this lease . . . without [landlord's] prior written consent, which consent shall not be unreasonably withheld." It also requires tenant to "submit to [landlord] in writing the terms and conditions of any proposed assignment." Tenant claims it properly sought assignment in a November 16, 2004 letter, but the letter only notifies landlord of tenant's intention to assign the lease; it does not provide the terms and conditions of the proposed assignment, as the lease required. Thus, tenant did not properly seek assignment. Landlord's obligation under the assignment clause was not triggered, and we need not address whether landlord reasonably withheld her consent.

*Affirmed in part, reversed in part and remanded for proceedings consistent with this decision.*